WEEGHMAN et al. v. KILLIFER et al.

(Circuit Court of Appeals, Sixth Circuit.   June 30, 1914.)

No. 2643.

EQUITY (§ 65*)—MAXIMS—CLEAN HANDS.

Defendant K., a baseball player of unique and extraordinary skill and expertness, contracted to serve the Philadelphia National League Club for the season of 1913, his contract providing that his compensation should be apportioned, 75 per cent. for services rendered and 25 per cent. for his covenant to abide by his reservation by the Philadelphia Club for the succeeding season unless released before its termination in accordance with the provisions of the contract, which covenant provided that he bound himself to contract with and continue in the service of the Philadelphia Club for the succeeding season at a salary to be determined by the parties. Complainants, desiring to employ him, before there had been any conference concerning his salary with the Philadelphia Club for the 1914 season, obtained a conference, and, though knowing of the reservation, asked him if he was under any obligation to play ball with the Philadelphia Club, and, he having replied that he had made no contract with them, complainants induced him to sign a contract with them by offering him a salary more than twice as large as he had previously received. After this, however, he made another contract to serve the Philadelphia Club in accordance with his reservation. *Held*, that, though such reservation was not enforceable at law as between the parties, being but an agreement to make a contract, complainants, having induced him to breach the same with knowledge thereof, and that there had been no effort to agree on terms between defendant and the Philadelphia Club, were not entitled to maintain a suit to enjoin defendant from performing his Philadelphia contract, under the maxim that he who comes into equity must come with clean hands.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*

He who comes into equity must come with clean hands, see notes to Knapp v. S. Jarvis Adams Co., 70 C. C. A. 543; Primeau v. Granfield, 114 C. C. A. 555.]

Appeal from the District Court of the United States for the Western District of Michigan; C. W. Sessions, Judge.

Suit by Charles Weeghman and another, partners doing business under the style of the Chicago Federal League Baseball Club, against William Killifer, Jr., and another. From a decree dismissing the bill, complainants appeal. Affirmed. For opinion below, see 215 Fed. 168.

The appellants sought a temporary restraining order in the court below, commanding William J. Killifer, Jr., to desist and refrain from performing any services as a baseball player for any other club than theirs during the years 1914, 1915, and 1916. The order was refused, and appeal taken. The relief asked is based upon averments of the bill of complaint that Killifer is a baseball catcher "of unique and extraordinary skill and expertness, and of such personal and intellectual character that his loss cannot be substantially compensated for by the services of some other baseball catcher," and that he had failed to keep his certain contract of January 8, 1914. The contract was made with the appellants as a copartnership doing business as the Chicago Federal League Baseball Club (herein called Federal Club); and it in terms binds Killifer to serve the Federal Club "and no other party" during

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Federal League baseball seasons of 1914, 1915, and 1916. On the petition of the Philadelphia National League Club (herein called Philadelphia Club) an order was entered below reciting that the "petitioner has an interest adverse to the complainants within the meaning of the equity rule," and permitting it to intervene as a party defendant with leave to answer complainants' bill. Killifer and the Philadelphia Club filed separate answers. Each of these defendants avers, in substance, among other things, that on April 18, 1913, the Philadelphia Ball Company (to the rights of which the Philadelphia Club has succeeded) and Killifer entered into a contract according to a copy attached as an exhibit. Killifer there agreed to perform for that club "and for no other party during the period of this contract * * * such duties pertaining to the exhibition of the game of baseball as may be required of him" for the National League season of 1913; and the first paragraph thereof contained this provision: "The compensation of the party of the second part (Killifer) stipulated in this contract shall be apportioned as follows: 75 per cent. thereof for services rendered and 25 per cent. thereof for and in consideration of the player's covenant to sanction and abide by his reservation by the party of the first part for the season 1914 unless released before its termination in accordance with the provisions of this contract."

By the eighth paragraph the club was given the right at any time during the period of the contract, to terminate it upon 10 days' written notice. The tenth paragraph was as follows: "In consideration of the compensation paid to the party of the second part (Killifer) by the party of the first part as recited in clause 1 hereof, the party of the second part agrees and obligates himself, to contract with and continue in the service of said party of the first part for the succeeding season at a salary to be determined by the parties to such contract."

· Both defendants aver that Killifer performed the contract of 1913 to the satisfaction of the Philadelphia Club, and that "after the end of said season, and prior to January 8, 1914, he was duly notified that an increased salary would be paid to him. He thereupon promised to play" with the Philadelphia Club in 1914 "and expressed his readiness to discuss the question of salary at the proper time." Nevertheless, on January 8, 1914, Killifer contracted with the Federal Club, as stated, and on the 20th of that month he entered into a similar contract with the Philadelphia Club for the same seasons. It is averred in the bill and admitted in the answers that complainants were in need of the services of players of skill and expertness, and it is admitted by the Philadelphia Club that Killifer "is a player of unique and extraordinary skill and expertness." The only evidence offered in support of the averments of the bill and answers was in the form of affidavits, with exhibits. Several days before the Federal Club contract was executed, the complainants and their manager brought about a meeting between them and Killifer, at their office in Chicago, and opened negotiations with him to enter the service of the Federal Club. Complainants, through their manager, had full knowledge of Killifer's previous relations with the Philadelphia Club and of the above quoted clause of reservation contained in his contract of 1913. It was the standard form of contract of the National Baseball League, and complainants' manager had admittedly during that year been manager of one of the National baseball clubs. The president of the Federal Club states in his affidavit that Killifer was asked at this meeting whether he was "under any contract to play baseball for the season 1914 and subsequent seasons with any baseball club," or whether he was "under any obligation to play ball" with the Philadelphia Club, that Killifer answered that he had not "made any contract or entered into any agreement to play ball" with the Philadelphia Club, or with "any other club for the year 1914 and subsequent years, and that he was free to make a contract" with the Federal Club. Killifer's account of this meeting is, in substance, that "they all talked" to him about his contract with the Philadelphia Club, and gave reasons why they considered a contract with "a Federal League Club to be a better contract for the player"; that he "would not be able to get a satisfactory salary from the Philadelphia Club, and offered to give him a large salary if he would leave" that

club and sign with the Federal Club; that they finally offered him "a three-year contract and nearly twice as much salary as he had received from the Philadelphia Club in 1913," and because of this "inducement" he "signed a contract with the complainants." When he signed this contract, Killifer was paid $525, but this money was returned by him later. Admittedly, at the time the Philadelphia Club made the contract with Killifer, January 20, 1914, the club knew that he had entered into the contract with the Federal Club. The president of the Philadelphia Club states that after the close of the season of 1913, Killifer gave the club no opportunity to take up with him the question of salary for 1914 until about January 20th; that Killifer is playing with the Philadelphia team, and is "an integral part thereof"; that he "fits in with the other players, gives confidence to the whole team, and is a drawing card with the public." Concededly, each of these clubs agreed to pay Killifer a materially larger salary than he had received in 1913, and the salary he is receiving from the Philadelphia Club is a decided increase over that agreed to be paid by the Federal Club. Each club avers and insists that it will suffer irreparable damage if it shall lose the services of Killifer.

Edward E. Gates, of Indianapolis, Ind., and Silas H. Strawn, of Chicago, Ill., for appellants.

George Wharton Pepper, of Philadelphia, Pa., for appellees.

Before WARRINGTON and DENISON, Circuit Judges, and TUTTLE, District Judge.

WARRINGTON, Circuit Judge (after stating the facts as above). The bill of complaint is not framed upon the idea, as of course under well settled principles it could not be, that complainants are entitled to an order or decree enforcing specific performance of the contract between the Federal Club and Killifer; but the theory is that under his negative covenant they are entitled to an order restraining him from playing with any other club. The theory so relied on is not contested. The controversy turns upon a question which may be stated thus: Whether, in view of their knowledge of the clause of reservation contained in Killifer's contract of 1913, complainants were entitled both to induce Killifer to contract to enter into their employ and to enforce their contract as far as may be by the process of injunction, since they took no appropriate steps in advance of the contract to ascertain what, if any, effort had been made and the result attained by Killifer and the Philadelphia Club, or either, to agree upon his salary for the year 1914.

The contention is in effect that any such question as this is answered by the proposition that the clause of reservation is not a contract. Indeed, complainants simply asked Killifer whether he was under any "contract" to play baseball for the season of 1914 with the Philadelphia Club, and contented themselves with his answer that he was not, and his opinion that he "was free to make a contract" with the Federal Club. It is not necessary to say more of the defect in the present clause of reservation than Judge Wallace said of a similar provision, though in a case unlike this, that it is "a contract to make a contract if the parties can agree," and that the portion remaining to be agreed on ultimately, in connection with the right given to the club to terminate the contract of 1913 upon 10 days' written notice, would have prevented enforcement of the reservation. Metropolitan Exhibition Co. v. Ewing, 42 Fed. 198, 204, 7 L. R. A. 381; Metropolitan Exhibition Co.

v. Ward, 9 N. Y. Supp. 779, 781 to 783; Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955. But in determining whether the present complainants are entitled to the aid of an injunction in recognition and support of their contract, we are not convinced that the clause of reservation in the contract of 1913 can rightfully be ignored. This clause was in terms based upon a consideration of 25 per cent. of Killifer's salary, or $750. Killifer had received the money; true, he received it under a provision that it should be paid, but not with any disclosed purpose to release him from his undertaking with respect to the season of 1914. He had distinctly covenanted to "sanction and abide by his reservation," and conditionally promised to "continue in the service" of the club during the season of that year. Surely all these acts meant something. Can it be said that no right can be predicated of such a promise? Could Killifer both break the promise and keep the money? Evidently the conditions requisite to making a contract were present— parties, consideration, and a lawful object. The privilege of continuing the player in the club's service, not merely the first privilege of employing him, for the next season, was reserved and conditionally given for a substantial sum of money paid and received. The contract in contemplation for the season of 1914, like the one for the season before, was of the standard type, and the salary would seem to have been the only undetermined feature; and so, in view of the liberal rules in relation to implied contracts, we think enough was done to invest the club with at least an equitable right to have Killifer endeavor in good faith to agree with it upon his salary before he should enter into a similar contract with another; it is needless to add that Killifer was under a corresponding obligation. Further, what rightful concern was it of the complainants that a means of escape, through the undetermined feature of the clause, was available to either of the parties to the contract of 1913? The complainants had never been parties to that contract; and if they had not interfered, it cannot under the evidence be doubted—as the District Judge in effect said—that Killifer would have carried out his arrangement with the Philadelphia Club. Why is this not a sufficient test of the right of complainants to an injunction?

This is not a suit to recover damages for inducing Killifer to repudiate his promise to the Philadelphia Club. It is a suit to enjoin him from ultimately keeping that promise, and maintained by the very parties who induced him to break it. More than a century ago it was said by Lord Ch. J. Eyre, in speaking of the act of an army recruiting officer who had induced a servant to leave his master and enter the army when under a voidable indenture, that the defendant "had no concern in the relation between the plaintiff and his servant, he dissolved it officiously, and, to speak of his conduct in the mildest terms, he was carried too far by his zeal for the recruiting service." Keane v. Boycott, 2 Bl. Rep. 511, 515. The decision in that case has been approved and the principle it announced applied in some well-considered decisions in this country. Haskins v. Royster, 70 N. C. 601, 611, 612. 16 Am. Rep. 780; Duckett v. Pool, 33 S. C. 238, 241, 242, 11 S.

E. 689; Noice, Adm'r, v. Brown, 39 N. J. Law, 569, 572, 573. See, also, Salter v. Howard, 43 Ga. 601, 604; Benton v. Pratt, 2 Wend. (N. Y.) 385, 390, 20 Am. Dec. 623.[1]

Furthermore, no just consideration of the facts disclosed in the instant case can fail to reveal a common purpose and for the common profit of the complainants and Killifer to set at naught the latter's obligation to the Philadelphia Club to endeavor in good faith to agree with that club upon his salary. Whether this amounted to a design to injure and defraud the Philadelphia Club or not, it was a legal fraud upon its right to have the contract avoided, if at all, only through an honest effort and failure to have the salary fixed. Such a fraud does not necessarily imply, nor is its existence dependent upon, an invasion of a *legal* right. It is a matter of indifference, then, that the clause of reservation did not amount to an ultimate mutual obligation; it was not avoided, as it might have been, in an honest way, but was consciously set aside and ignored to the manifest injury of the Philadelphia Club. We, therefore, do not see how the present case can at bottom be effectively distinguished from ruling principles declared in decisions like Rice v. Manley, 66 N. Y. 82, 23 Am. Rep. 30, and Angle v. Chicago, St. Paul, etc., Railway, 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55; for, as respects the intermeddler, it cannot be that the particular reason which would enable either party to a contract to avoid it is material.

In Rice v. Manley, an agreement had been made to purchase a quantity of cheese at a future date. There had been no compliance with the statute of frauds, and the agreement was not binding on either party for that reason. Both parties would have performed the agreement

---

[1] We are not unmindful of the insistence, nor of its force, that an action for damages cannot be maintained at law for the procurement of breaches of contract between employer and employé unless the contract is valid and binding; but, not deeming it necessary here either to determine that question or the alternative one touching the need of de facto service, we may remark upon complainants' citations in that behalf: Lord Denman's suggestion, when considering a contract that "was altogether on one side," that a third person would not be heard to take objection to the invalidity of a contract between a master and servant where "the servant was de facto continuing in the service," was hardly necessary, because in the case before him the servant "had quitted his master and taken his chance in hiring himself to the defendant." Sykes v. Dixon, 9 Ad. and El. 693, 699; Cockburn, C. J., thought that a count for enticing away an apprentice could not be sustained under the statute (8 Ann. c. 9) for the reason that it was clear and peremptory, saying: "There is no valid contract of apprenticeship. But we incline to think that, if the action had been brought on the footing of the youth being the *servant* of the plaintiff, the defendant would have been liable, there being evidence of enticement." And the case was sent back for amendment and new trial. Cox v. Munsey, 6 C. B. (N. S.) 376, 383. In Campbell v. Cooper, 34 N. H. 49, the action for enticing a minor to quit the service of his employer failed, because the agreement of the servant had been signed by his father instead of the servant himself, and so was not in accord with the statute of the state. Davidson v. Oakes (Tex. Civ. App.) 128 S. W. 944, holds that an action to recover damages for inducing one to break his oral contract to convey real estate to another cannot be maintained. In Case Machine Co. v. Fisher, 144 Iowa, 45, 122 N. W. 575, it did not appear that the defendants had knowledge of the existence of any contractual relations which would prevent them from offering inducements to the agents whose conduct was in question.

but for the fraud of the defendant. The defendant, knowing of the agreement, for the fraudulent purpose of defeating its performance by the seller, of depriving the purchasers of the benefit thereof, and of himself obtaining the cheese, employed a fictitious telegram to induce the seller to change the sale from the original buyers to the defendant. The referee allowed damages, and was ultimately affirmed. In the course of the opinion, Earl, J., said (66 N. Y. 84, 23 Am. Rep. 30):

"What difference can it make that plaintiffs could not enforce their agreement against Stebbins? The referee found that Stebbins would have performed the agreement, and that plaintiffs would have had the benefit of it but for the fraud of the defendant. How, then, can it be said that plaintiffs were not damaged; that there was not both fraud and damage so as to satisfy the rule above laid down? Plaintiffs' actual damage is certainly as great as it would have been if Stebbins had been obliged to perform his contract of sale, and greater, for the reason that they cannot indemnify themselves for their loss by a suit against Stebbins to recover damages for a breach of the contract."

In Angle v. Chicago, St. Paul, etc., Railway, the state of Wisconsin had, for the purpose of constructing defined railroads, granted certain lands to a company called the Omaha Company, and another portion to a company called the Portage Company. The latter grant was conditional upon the completion of the road within a fixed time. After passing through various financial embarrassments and difficulties the Portage Company at last effected a plan to complete the road within the extended time granted. The plan involved a construction contract about the validity of which, it is true, no question was made; but the important feature of present relevance was the legislative right to avoid the land grant. The Omaha Company, having designs on this land grant, so interfered with the performance of this contract as to induce the Legislature to revoke the grant and to make a regrant to the Omaha Company. To a suit to subject the lands to the payment of a judgment for damages previously recovered because of such interference, numerous defenses were set up. One was that the Portage Company was in default, and the Legislature had the absolute right to forfeit the grant. To this Mr. Justice Brewer (approving Rice v. Manley) answered, 151 U. S. 23, 14. Sup. Ct. 248, 38 L. Ed. 55:

"Assuredly it does not lie in the power of the wrongdoer, the party whose wrongs created that condition which induced the legislative forfeiture, to excuse its wrongs on the ground that the Legislature had the power to forfeit, and might have done it anyway."

Is it to be said then that the complainants are in a position rightfully to invoke the process of injunction in aid of the enforcement of their contract? We are thus led to agree with Judge Sessions that the complainants' suit could not be sustained under the maxim: "He who comes into a court of equity must come with clean hands"; and the application of the rule is made exceptionally clear by the learned trial judge.[2]

[2] Otis v. Gregory, 111 Ind. 504, 508, 13 N. E. 39, 43, does not sustain the claims made under it by the present complainants. It was a suit to quiet title to real estate. The defendant had released a mortgage on certain land in Michigan to assist plaintiff, a married woman, to sell the property and reinvest in land in Indiana, but he did so under a promise of plaintiff that she would give him a mortgage upon her Indiana property to secure payment of

It is vain to urge that he abused his discretion. It is claimed that the competitive conditions requisite to baseball leagues, baseball clubs, and the players themselves, entitle the complainants to relief. The obvious answer is that frank and prompt dealings on the part of clubs and players signing contracts of reservation would avoid all delay and embarrassment. Indeed, there is no perceivable reason why Killifer alone could not have duly brought the question of his salary and further connection with the Philadelphia Club to a close and in time to have obtained employment elsewhere if found necessary. Moreover, it is by no means certain that a restraining order would result in causing Killifer to enter the service of the Federal Club, but under the evidence it is certain that serious injury to the Philadelphia Club would ensue; and it cannot escape attention that the foundation of an order that would inflict such an injury upon one of the defendants would, in its last analysis, be the conduct of the complainants and Killifer. It scarcely need be added that complainants are in no position to urge that either party to the contract of 1913 was guilty of laches respecting the exercise of the privilege reserved and given under the clause of reservation.

The order denying a temporary injunction is affirmed, with costs, and with direction to dismiss the bill, unless complainants show to the satisfaction of the trial judge that, under appropriate amendment to their bill of complaint, they are able to and will at final hearing produce additional and substantial evidence; but such dismissal, if ordered, shall be without prejudice to the rights of any of the parties to institute such actions at law as they may be advised respecting the subject of the present suit.

the amount of the released mortgage. By the statute of Michigan, married women were empowered to convey or mortgage their separate real estate in all respects as if they were unmarried; but this was not so in Indiana. The mortgage so to be given in exchange was executed alone by the plaintiff, and the object of the suit was in reality to escape payment of the Michigan loan. The plaintiff failed, and the suit was remanded with leave to both parties to reform their pleadings, so that the loan of defendant could be provided for. This was done in recognition of the maxim, "He who seeks equity must do equity."