## CARMEN v. FOX FILM CORPORATION et al.*

(Circuit Court of Appeals, Second Circuit. November 10, 1920.)

No. 29.

**Equity ☞65(2)—Inequitable conduct bar to relief.**

When about 20 years of age complainant contracted her services as a motion picture actress to defendants for a term, including options for renewals, of some 4 years. A few months later, while still under 21, representing herself free to do so, she made contracts with another for her services covering the same time. *Held* that, whether or not as matter of law she might avoid her contracts with defendants on the ground of her minority, her conduct was such that a court of equity would grant her no relief against them.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Jewel Carmen against the Fox Film Corporation and the William Fox Vaudeville Company. Decree for complainant, and defendants appeal. Reversed.

For opinion below, see 258 Fed. 703.

Saul E. Rogers, of New York City (E. Henry Lacombe, of New York City, of counsel), for appellants.

Nathan Burkan, of New York City, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The plaintiff seeks to have certain contracts declared void which she alleges that she made with the defendants during her minority, and she prays that an injunction be issued restraining the defendants from asserting that the contracts are valid and from interfering with her contract relations with any person, firm, or corporation in employing the plaintiff and availing himself or itself of her services under any contract of employment entered into with her. Damages are also asked.

The court below has adjudged that the contracts were duly rescinded by her and have been null and void since July 15, 1918, and has issued a perpetual injunction as prayed, and awarded her damages in the sum of $43,500.

The plaintiff is a moving picture actress, and in her complaint alleges that at all the times mentioned therein she was and still is a citizen and resident of the state of California. The defendants are corporations organized under the laws of the state of New York, and are each engaged in the business of manufacturing and producing photoplays.

The contract with the Fox Film Corporation, which is one of the contracts the plaintiff repudiated and asks to have declared void, provided employment for a period of one year, commencing October 17, 1919. The compensation agreed upon was $175 per week. In consideration of $1,300, which was to be paid in weekly installments of $25, an option was given to continue the employment for further

periods of six months each until said employment extended over to October 17, 1921. The salary stipulated, if the options were exercised, was $200 per week for the first year, $225 per week for the first half of the second year, and $250 per week for the second half of the second year until October 17, 1921, the termination of the contract.

The contract with the William Fox Vaudeville Company which the plaintiff also repudiated, provided employment for six months with the option in the company to employ her for a further six months until the employment extended over to October 17, 1919. The salary, if the options were exercised, was $125 per week for the first six months; $150 per week for the second six months; $200 per week the last six months and until the termination of the contract. The consideration for the several options was $650 for each of the options.

Each of these contracts was executed on July 31, 1917, and in each of them the plaintiff is described as of the city of Los Angeles in the state of California.

Prior to the plaintiff's repudiation of the agreements above mentioned and while they had still several years to run, and on March 28, 1918, a few months before she attained her majority, the plaintiff entered into a contract with the Frank A. Keeney Pictures Corporation for her exclusive appearance in motion pictures under its employment for a period of two years commencing on or about July 15, 1918. Under this agreement the Keeney Corporation was to pay to the plaintiff at the end of each week for 46 consecutive weeks the sum of $450. And for the first six months during the year commencing July 15, 1919, she was to be paid $500 for each week, and for the last six months she was to be paid the sum of $550 per week. The contract also gave to the Keeney Corporation an option on her exclusive motion picture services for one year commencing July 15, 1920, the corporation agreeing to pay her if it availed of the option $600 per week for the first six months, and $650 per week for the last six months. The contract also provided that the corporation should have a further option for her exclusive services for the year commencing July 15, 1921, her compensation to be $700 per week for the first six months, and $750 for the last six months. It granted the corporation a further option for the year commencing July 15, 1922, the compensation for the first six months to be $800 per week, and for the last six months $850 per week. It granted the corporation the further option for the year commencing July 15, 1923, her compensation to be $1,000 per week for each and every week.

The negotiations leading up to the signing of the agreement with the Keeney Corporation were opened by Frank A. Keeney, the president of that corporation, who telegraphed the plaintiff asking whether she was open to an engagement. Her reply was that she was free to accept employment. Thereupon he sent to her the contract as prepared. It was submitted by her to her attorney in Los Angeles, and then was signed by her in California. At the time this contract was made Keeney had no knowledge that the plaintiff had contracts with these defendants extending beyond July 15th, and if he had known the facts he would not have made any contract with her. When later

on Keeney learned what the facts were, he having been informed by Fox that his corporations had contracts with the plaintiff which still had several years to run, he refused to recognize the contract which he had made or to proceed under it. He testified:

"I would have entered into no negotiations with Miss Carmen unless I thought that she was absolutely free to come to me on July 15th, free and clear in every manner, shape, or form without any technicalities."

He also testified:

" * * * I wanted Miss Carmen's services, but I didn't want her services if there was any litigation about it; that is what I was trying to keep out of, that is, litigation."

It appears that defendants on receipt of the plaintiff's notification of her repudiation of her contracts with them, on the ground of her infancy, instructed their lawyers to inform the plaintiff that they intended to hold her to the performance of the contracts, and that they would seek adequate and proper relief to restrain the violation thereof. This information they communicated to her on July 17, 1918. And on July 12, 1918, the William Fox Vaudeville Company, through its attorneys, had informed Keeney as follows:

"We hereby serve you with notice that we still claim our rights to her services under her contract, and that we will hold her strictly to the performance of her contract, and will hold you if you permit her to breach her contract by performing any services for you.

"We are giving this notice to you in advance of her rendering any services for you, so that, if you engage her services after this notice, you will do so with full knowledge of all the facts."

On September 19, 1918, the William Fox Vaudeville Company and the Frank A. Keeney Pictures Corporation and Frank A. Keeney entered into an agreement wherein the Keeney Corporation and Frank A. Keeney agreed to refrain from engaging the services of the plaintiff pending the determination of the rights of the respective parties, and the Fox Company agreed to indemnify and save harmless the Keeney Corporation and Keeney himself from any damage they might suffer by reason of any action the plaintiff might bring against them.

The plaintiff in her complaint alleged that the contracts with the defendants were signed, executed, and delivered to the plaintiff by the defendant in the city and state of New York. The answer does not deny this allegation. But the defendants claim that in fact the contracts were executed in California, and that under the law of that state they were binding upon her, as in California a young woman becomes of age at 18. Under the New York law a young woman does not become of age until she reaches 21. The court below, in view of the allegation in the complaint and the failure in the answer to deny it, has held that the contracts between the plaintiff and the defendants were New York contracts and governed by the New York law, and therefore voidable, as under New York law the plaintiff was not of age when she signed them. It is contended that this was error, and that the capacity of parties to contract is to be determined by the law of the domicile, or, according to some authorities, by the law of the place of performance. In the view we take of this case it is not

material whether the contract was binding and breached, or voidable and avoided. In either case the conduct of the plaintiff has been such as entitles her to no relief in this court. According to her own allegations in her complaint, she was a minor when she entered into the contract with Keeney, and she misled him into making the contract by representing that she was free to make it, when in fact she was morally not free to make the contract, and there was doubt whether she was legally free to make it. If the contracts with defendants were valid, she was under a legal and moral obligation not to make the contract with the Keeney corporation. And if the contracts were voidable because of her infancy, then, while she was under no legal obligation to recognize them, she was under a moral obligation to abide by them, and good faith required her to continue to render the services she had agreed to give. In either case her action in repudiating her pledged word was misconduct of which no person of honor and conscience would have been guilty. That no action could be brought against her at law because of what she did does not alter the moral character of her act. And when she comes into a court of conscience and asks its affirmative aid to assist her in carrying into effect the inequitable arrangement into which she unfaithfully entered, the appeal falls on deaf ears. One who comes into equity must come with clean hands, and her hands are not clean. The testimony discloses that reliance cannot be placed upon her agreements which the law does not oblige her to keep, and that for a money gain to herself she unscrupulously disregarded her express contracts.

In Story's Equity Jurisprudence (14th Ed.) vol. 1, § 99, the rule is laid down as follows:

"Equity imperatively demands of suitors in courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly 'within the law.' Misconduct which will bar relief in a court of equity need not necessarily be of such a nature as to be punishable as a crime or to constitute the basis of a legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean. Both courts and text-writers have repeatedly spoken upon this subject in no uncertain language."

In Pomeroy's Equity Jurisprudence (3d Ed.) vol. 1, § 398, it is said:

"Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days that, while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial contro-

versies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies."

The maxim that one who comes into equity must come with clean hands expresses rather a principle of inaction than one of action. It means that equity will refuse its aid in any manner to one seeking its active interposition if he has been guilty either of unlawful or inequitable conduct respecting the subject-matter of the litigation.

An illustration of the maxim is found in the attitude of courts of equity in the matter of specific performance. A court of equity always refuses specific performance of a contract which has been obtained by the plaintiff by sharp and unscrupulous practices, by over-reaching, by concealment of important facts, even though not actually fraudulent. The contract may be a legal one, against which no defense could be set up at law, and one which a court of equity would not cancel. But if it has been procured by unconscientious means a court of equity refuses specific performance. Pomeroy's Equity Jurisprudence (3d Ed.) vol. 1, § 400.

The right which one seeks to enforce in a court of equity must be one which in and of itself appeals to the conscience of a chancellor. Mr. Justice Brewer, speaking for the court in Deweese v. Reinhard, 165 U. S. 386, 390, 17 Sup. Ct. 340, 341 (41 L. Ed. 757), said:

"A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make or them in a court of law, he will be held remediless in a court of equity."

In T. B. Harms & Francis, Day & Hunter v. Stern, 231 Fed. 645, 648, 145 C. C. A. 531, 534, this court said:

"The plaintiffs are in a court of equity, which is a court of conscience, which within the scope of its powers is governed by its own rules. It stays its hand and withholds its aid whenever it is asked to do that which it deems to be against conscience."

In Weeghan v. Killefer (D. C.) 215 Fed. 168, the complainants sought an injunction to restrain the defendant from playing baseball with any club other than their own. It was found by the court that he was a player of unique, exceptional, and extraordinary skill. But complainants, knowing that he had entered into an unenforceable agreement to play as a member of another club, had induced him by the offer of a larger salary to break his agreement and play with their own club. Then he was induced to repudiate the agreement with the complainants and to enter into a new agreement to play with the club with which he had originally contracted. An injunction was sought by complainants to restrain him from doing so. This was refused on the ground that complainants' conduct in inducing him to break his unenforceable agreement was such misconduct in regard to the matter in litigation as honest and fair-minded men would condemn and pronounce wrongful, and, although insufficient to constitute the basis of legal action, was quite sufficient to bar relief in equity. The complainants' hands were not clean. The case was appealed to the Circuit Court of Appeals for the Sixth Circuit and was affirmed, 215 Fed. 289, 131 C. C. A. 558, L. R. A. 1915A, 820.

In Michigan Pipe Co. v. Fremont Ditch, Pipe Line & Reservoir Co., 111 Fed. 284, 49 C. C. A. 324, relief was refused because of bad faith, sharp practice, and unconscionable acts. It was said that a suit in equity is an appeal for relief to the moral sense of the chancellor, and that a court of equity is the forum of conscience.

"A court of equity," it was said, "will leave to his remedy at law—will refuse to interfere to grant relief to—one who, in the matter or transaction concerning which he seeks its aid, has been wanting in good faith, honesty, or righteous dealing. While in a proper case it acts upon the conscience of a defendant, to compel him to do that which is just and right, it repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit."

In 1859 in a case before the Court of Appeal in Chancery, Nelson v. Stocker, 4 De Gex & J., 458, 464, Lord Justice Turner, in commenting on the fact that the defendant had represented himself to be of age when he was not of age, said:

"It is too much to call upon the court to believe that this defendant could really have thought himself to be of age at the date of the settlement, when he was under 18 years of age; and if he did not so think, the representation he made to the solicitor was false and fraudulent. Infants are no more entitled than adults are to gain benefits to themselves by fraud. * * *"

In 1816 a case came before Vice Chancellor Plumer, Cory v. Gerteken, 2 Maddox, 40, in which an infant who was nearly of age prevailed upon his trustees to transfer to him certain stock to which he was entitled on coming of age, and represented to them that they ran no risk in doing it. After coming of age he assigned his rights to an assignee, and suit was brought against the trustees on the ground that payment to an infant was bad. The bill was dismissed and the Vice Chancellor said:

"The concealment of his infancy, under such circumstances, certainly was a fraud, and precludes him, or his assigns, who stand precisely in his situation, from calling for a repayment."

The fact that a contract has been dishonestly or dishonorably obtained is a bar to relief in equity.

Decree reversed.