## WILLIAMS v. SINCLAIR REFINING CO.
### Civ. No. 1216.

District Court, N. D. Texas,
Fort Worth Division.
Oct. 15, 1947.

Frank Potter, U. S. Dist. Atty., of Fort Worth, Tex., for plaintiff.

Cantey, Hanger, McKnight & Johnson, and Alfred McKnight, all of Fort Worth, Tex., for Sinclair Ref. Co.

Lindsay P. Walden, of Fort Worth, Tex., for third party.

DAVIDSON, District Judge.

In this case now on trial, Roscoe Williams, v. Sinclair Refining Company, No. 1,216, the plaintiff appearing by the United States District Attorney, brings suit against the Sinclair Refining Company, the defendant, under the Veterans' Act, allowing them the right to reclaim their former position upon their return from the service.

The defendant, Sinclair Refining Company, has impleaded as third party defendant, the union, the Oil Workers International Union, claiming that it was their interference that prevented the defendant from according the recognition of the seniority rights of Williams and, therefore, deprived him of the amount involved.

It is not a suit for reinstatement in the way of a mandatory order of the court, it is a suit for the difference in what he did earn and what he might have earned had his right of seniority been recognized and restored to the job that he claimed he was entitled to.

The policy of our government must, of necessity, be determined by Congress. On that December 7th, when the American Navy went to the bottom, or a great deal of it, in Pearl Harbor, we were suddenly confronted with the fact that we were up against powerful enemies in a world of conflict, not only on the front, but on the rear, and on the right and on the left. There was a two-ocean navy to be formed; there was a two-continent army to be organized. Congress outlined the policy, not only for the organization of the army, but for the care of the men who entered the army. This policy was, no doubt, influenced by the desire to let the soldier feel, the citizen that was to be a soldier, that when he went to serve his country, he might sacrifice his life, but if he returned, his position, his job, would be open to him where he could take up again the thread of life without losing his seniority or standing.

As a part of the same general policy, it provided that if he left dependents at home, an allotment should be made to them; that was to make him, no doubt, better satisfied while he was over there.

Now the war was fought, and fought successfully. The plaintiff, Williams, came home. He went to his former employer and asked for his old job. When he asked for it, there was a conflict as to which of two men were entitled to it. His company was inclined to honor his request. The union that was under contract with the company, through a committee, legally constituted, it seems, filed a contest, or a protest, in some form, against his receiving this seniority and being returned to the job that he claimed. A hearing was had before the Board of Arbitrators in which the issue was decided against Williams. Williams was not present at the arbitration; so far as the record shows, he was not invited to be present. Presumably, he was represented by the union, which was the bargaining agent, but the other claimant on the job was also entitled to the same right to be represented by the union. A man cannot serve two masters; an agent cannot serve two principles, and the union could not act for both Williams and the other claimant; therefore, it cannot be said that Williams had any representation at the arbitration. An arbitration is a form of adjustment of controversies that is recognized as good policy and recognized by our law, and whenever a man enters into arbitration, he is bound by the proceedings. Perhaps it would have been well for one or both of the parties to have induced Williams to enter the arbitration.

One of the oldest and most persistently recognized principles of our jurisprudence is that every man is entitled to his day in court. Williams has never had a day in court until this trial.

The court has weighed the evidence and is of the opinion that he was entitled to the job and that he should recover in this suit, as provided by the Act of Congress set out in Title 50 U.S.C.A.Appendix, § 308.

Now we come to the crux of the second point. Was the act of the labor organization such as would justify the corporation, the defendant, Sinclair Company, of bowing to its order. Should it have disregarded the union's protest and gone on and reinstated Williams, or should it have heeded it.

As time rolls by, we gain a very wholesome respect for different things, and the

world in recent years has gained, or has had instilled into it, a respect for organized groups. A respect born of the power and ability they have to do things. To use just a homemade, commonplace illustration—an old pioneer was riding behind his team. He had a long ox whip, and he could hit like a rifle with it. A horse fly lit on the shoulder of the ox. The ox was helpless. The driver cracked his whip, cutting the fly in two. His companion, interested in his skill and marksmanship with the whip, discovered a hornet's nest, and said, "Let me see you take your whip to *that* boy". "No, they are organized." Now, while that is a crude illustration, it is nevertheless illustrative of the power of organized efforts. Organized groups have power of directing, influencing, and controlling.

Our government has done all it could to preserve that balance wheel of power between different people and different groups, in order that liberty might be maintained. It was with that idea in view that the great kings of industry were shorn of their power in their treatment of labor.

In this case labor was restricted, to a certain degree, in favor of the soldier.

Was that pressure sufficient to put the Sinclair Company in fear so as to cause them not to do that which the law commanded? If it was, then the judgment should be rendered over against the union.

There was a rule of common law that our ancestors brought across the seas that forbade one person's interfering with the employee of another. Such rule might be stated in the following proposition : "It is an actionable wrong for a third party without justification to induce a party to a contract to break his agreement." Lumley v. Gye, 2 El. & Bl. 216.

As we recall the facts of the Lumley case, one theater had hired a singer believed to be able to draw the crowds to a show. The rival theater, not being able to secure the services of a like attraction, induced the singer to breach her contract, and thus she refused to sing. The second theater was held liable for its action.

Our own courts have followed this doctrine with approval. American Malting Co. v. Keitel, 2 Cir., 209 F. 351. This has become a uniform ruling. Speaking of it, the Harvard Law Review, Vol. 39, Pages 49 and 50 says: "The great weight of modern authority requires that a defendant that has induced a third party to break a contract with the plaintiff is liable in court".

"One who maliciously or without just cause or excuse or lawful justification procures the discharge of a servant from his employment is liable to him for the resulting damages;—nor is it a defense that defendant acted on the advice of counsel where only compensatory damages are claimed." 39 Corpus Juris, § 1613 of Master and Servant, citing in note Carmen v. Fox Film Corporation, D.C., 258 F. 703; Reversed on other grounds. 2 Cir., 269 F. 928, 15 A.L.R. 1209; Evans v. McKay, Tex.Civ.App., 212 S.W. 680; United States Fidelity, etc., Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520; Tennessee Coal, etc., Co. v. Kelly, 163 Ala. 348, 50 So. 1008; Southern Finance Co. v. Foster, 19 Ala.App. 109, 95 So. 338.

"Malice in the sense of actual ill will on the part of the person procuring the discharge need not be shown, it being sufficient that there was an intentional interference without just cause or excuse." 39 Corpus Juris, § 1614 of Master and Servant, citing in note Carmen v. Fox Film Corp.

"There is no sufficient justification where the end sought to be attained is to cause the employee to surrender a claim or to prevent him from earning money." 39 Corpus Juris, § 1614 of Master and Servant, citing London Guarantee, etc., Co. v. Horn, 206 Ill. 493, 69 N.E. 526, 99 Am.St.Rep. 185, affirming 101 Ill.App. 355.

"To do intentionally that which is calculated in the ordinary course of events to damage and which, in fact, does damage another person in his property or trade, is malicious in the law, and is actionable if it is done without just cause or excuse." Carmen v. Fox Film Corporation [258 F. 706] cited above.

As we have held in the forepart of this opinion, the evidence abundantly shows that the plaintiff Williams would have been restored to his position and seniority, but

for the intervention of the union, through the protest filed by its committee and the award made by the arbitrators, to which Williams was not a party.

It is suggested that the other party, Bateman, who drew the money that Williams should have received, be required to pay back this money. We think the most that could be asked of Bateman would be to reimburse the union when it reimburses Williams. The union has not asked any judgment against Bateman, hence no action will be taken by the court.

Judgment, therefore, will be ordered in favor of Williams, with recovery for the same amount against the third party defendant, Oil Workers International Union.