KOOL VENT METAL AWNING CORP. OF AMERICA v. BOTTOM et al.

No. 6832(2).

United States District Court
E. D. Missouri, E. D.

Jan. 31, 1951.

Lawrence C. Kingsland, Edmund C. Rogers and Kingsland, Rogers & Ezell, all of St. Louis, Mo., and Coleman Harrison, of Pittsburgh, Pa., for plaintiff.

Lawrence H. Cohn and Terry & Cohn, all of St. Louis, Mo., for defendants.

HULEN, District Judge.

Plaintiff, by contract with George A. Houseman, acquired the right to use of the trade name "Kool-Vent" and to grant licenses in 35 states for the manufacture and sale, under that name, of patented aluminum awnings. On March 16, 1946, it entered into a license agreement with defendant Bottom. The license agreement was pursuant to plaintiff's plan of exploiting the awning patent commercially under the name "Kool-Vent", by granting exclusive territorial licenses for the manufacture and sale of such awnings and use of trade name. The territory covered by the license agreement with Bottom was St. Louis and certain Missouri counties. A second license agreement was entered into on November 3, 1947. The second agreement enlarged the territory covered by the first agreement. Both agreements contemplated Bottom would organize corporations to manufacture and sell the awnings and authority to assign the license agreements was ac-cordingly given. The defendant corporations, controlled by defendant Bottom, were organized in furtherance of this plan.

Plaintiff now seeks a decree of specific performance of part of the license agreements, after defendants had served notice to cancel, defendants claiming they had been substantially evicted under the licenses, by an infringement suit decided against the Houseman patent, and plaintiff's repudiation of certain major obligations in the license agreements.

The execution of the license agreements with defendants proceeded without incident until November, 1948. A large quantity of awnings were manufactured and sold by defendants under the license agreements.

Certain of the patent rights held by plaintiff and covered by the license agreements rested on an interest acquired by plaintiff in a patent granted to Houseman. A prior patent on the same construction was Matthews Reissue Patent No. 21053, owned by National Ventilated Awning Company. At the time of the first licensing agreement between plaintiff and defendant litigation was pending against another licensee under the Houseman patent, on a claim that the Houseman patent infringed the Matthews patent. In that case the Houseman patent was sustained in the trial court, but was held to infringe on appeal. Thereafter, plaintiff in this case sought a declaratory judgment in the Federal Court at Cleveland, Ohio, on the issue of infringement of the Matthews patent, and suffered an adverse ruling in September 1948, from which no appeal was taken. Plaintiff then started negotiations with the holders of the Matthews patent to acquire the right to use and license users, such as defendants, in the manufacture of the structure covered by the Matthews patent. Plaintiff consummated such an agreement with the holders of the Matthews patent on May 1, 1949. Meantime the owner of the Matthews patent had filed suit in this Court against the defendants in this case, charging defendants with infringing the Matthews patent by virtue of structures manufactured under the license agreements between plaintiff and defendants in this case.

A temporary injunction is now in force against defendants in that case.

The license agreements between plaintiff and defendants provide that if defendants are sued for infringement, plaintiff will undertake the defense of any such suit on request. When the holders of the Matthews patent instituted proceedings against the defendants in this Court, on request, plaintiff undertook the defense of that case and continued to conduct the defense until May 1, 1949. By the settlement agreement with holders of the Matthews patent plaintiff bound itself not to further defend any such suits on behalf of its licensees.

By the two license agreements sued on plaintiff bound itself to give defendants the rights of manufacture and sale on any further awning patents it might acquire the use of. By the settlement contract with the holders of the Matthews patent plaintiff agreed to conditions that made it impossible to carry out that provision of its license agreements with defendants.

Plaintiff executed the Matthews settlement agreement without approval of defendants. In conformity with the Matthews settlement agreement, but in violation of the license agreements between plaintiff and defendants, plaintiff, soon after it executed the Matthews agreement, caused its counsel to withdraw from defense of the infringement suit pending against defendants in this Court.

In September, 1949, defendants served notice on plaintiff of cancellation of the license agreements entered into between plaintiff and defendant Bottom.

Defendants' notice of cancellation includes these recitals as reason for cancellation:

"After the Cleveland trial you advised us by letter that we should cease making ventilated roof awnings to avoid further liability by reason of the Matthews patent. * * *

"We made the necessary changes in our tooling and manufacturing operation, to avoid the Matthews liability, * * *. Such has definitely not proved to be the case, and on March 18, 1949 the Court enjoined us from manufacturing the awning construction for which we contracted with you.

"To make matters even worse, not only have you renounced your obligations to us, but in flagrant violation of your duties to us have joined forces with National against us. Your agreement with National is a conspiracy in violation of the Anti-Trust Laws, and a direct violation of the agreement of March 16, 1946 between your company and ours."

Defendant Mid-West paid royalties to plaintiff until November 1, 1948, and defendant Aluma until January 31, 1949. It is defendants' position that the awnings made by them subsequent to November, 1948, are of a type not covered by the license agreements with plaintiff. Payment of royalties after that date was represented by defendants as done because they thought the right to proceed under the contracts with plaintiff had been halted only for a short period, in contemplation of settlement of the Matthews patent claims. Defendants assert they own the trade name "Kool-Vent", for use in the St. Louis territory.

Defendants by counterclaim seek to recover expenses incurred in defense of the Matthews patent suit; damages for breach of contract resulting from plaintiff executing the Matthews agreement; and also damages based on an alleged violation of the anti-trust laws by plaintiff.

· I.

This controversy starts with the loss by plaintiff of its declaratory judgment suit in Cleveland in September of 1948 to the holders of the Matthews patent. Plaintiff was then, that is on loss of the Matthews case, under no legal obligation to defendants to secure a licensing right agreement with holders of the Matthews patent. That was one of the hazards to defendants of the character of license agreement executed by the parties. Chicago & A. Ry. Co. v. Pressed Steel Car Co., 7 Cir., 243 F. 883.

The essence of the dispute on the structure involved is an aluminum awning, the top of which has alternating pans so spaced as to permit air to circulate between the

pans. The air circulation is the result of raising the top pans slightly. It was the air circulating feature that was held to infringe the Matthews patent. By "jamming" the pans, that is lowering the top pan so as to stop the flow of air, infringement was avoided.

Defendants, of their own volition, and on advice from plaintiff, were relegated to the manufacture and sale of jammed pan awnings following the ruling in the Cleveland suit. Plaintiff offered evidence, and now argues to the effect, that defendants' position thus circumscribed was not detrimental to the financial success of their operations. We think the value of patent rights permitting manufacture and sale of open pan awnings is evident, by the extent to which plaintiff went to obtain them after it had lost its case to the Matthews patent holders. On May 1, 1949, plaintiff executed a contract with holders of the Matthews patent, by the terms of which it was to pay $50,000 in settlement of all claims of Matthews against plaintiff's licensees, including defendants, on certain conditions, namely surrender of existing license agreements by plaintiff's licensees and acceptance by them of a new one. Plaintiff received the right to grant sub-licenses in certain territories. To secure performance by plaintiff to holders of the Matthews patent, plaintiff placed in escrow all its patent rights, present and future, trademark and all sub-licenses entered into by it.

In the settlement of May 1, 1949, with Matthews, without any basis in truth plaintiff held out that it "controlled" the defense in the suit against defendants, and there attempted to dispose of the case, along with other litigation, as follows:

"It is agreed that in order to dispose of the pending litigation involving Koolvent and in which litigation Koolvent is conducting and controls the defense for their several licensees *and is authorized* to bind their licensees [Emphasis added.]

\* \* \* \* \* \*

"(b) That Consent Decrees shall be entered in the other pending suits comprised in Exhibit B attached hereto adjudging that the Matthews Patent is valid and that the several defendants therein have infringed upon Claims Nos. 3, 4, 5, 9 and 10 of said Patent; that injunction shall issue in each of said cases enjoining further infringement of said patent during the life thereof;

"(c) That accountings in the several litigations referred to shall be deferred for a period of thirty (30) days during which period the several licensees involved in said litigation may conform to the requirements of this contract, whereupon Judgment shall be entered for no damages."

The license agreements between plaintiff and defendants contain two provisions now in issue, by reason of the situation that arose on plaintiff's execution of the settlement agreement on May 1, 1949, with holders of the Matthews patent. Each license agreement contained a clause obligating plaintiff to defend, as follows: "In the event that the Licensee is sued for infringement of any United States Letters Patent, by reason of its making and selling the Licensed Inventions, The Corporation will, at the request of the Licensee, and if immediately notified by the Licensee of the filing of any such suit undertake, at its own expense, the defense of any such suit, but this liability of The Corporation to undertake such defense is to be assumed only when The Corporation is notified of the filing of the suit within ten (10) days after service thereof upon Licensee and The Corporation's liability is restricted to the defense of the suit."

When the Matthews patent-holder sued defendants, plaintiff "undertook" the "defense" of that case under the responsibility placed on it by the provisions of the licenses just quoted, and defendant was so engaged, through counsel of its own choosing, on May 1, 1949.

Each of the license agreements contained a clause on right of defendants to use "further" inventions, acquired by plaintiff, as follows: "The Corporation shall communicate to the Licensee any improvement or further invention it may discover or acquire in connection with metal awnings and shall disclose to the Licensee the manner of making and using the same and the Licensee shall be at liberty to manufacture

and sell metal awnings containing any such improvement or further invention within the limits aforesaid during the subsistence of this license free of all further royalties, charges, or payments whatsoever." In a supplement to the second contract also appears the following: "That Licensee has been advised of a claim by the inventor, or patent holder, or licensee, of an awning composed of wooden slats and of litigation heretofore instituted on account of said invention against the KoolVent manufacturer in Atlanta, Georgia, (who is not a licensee of the First Party); and that First Party in behalf of its Licensees is undertaking to reach an accord with said claimant. If First Party reaches such accord, Licensee agrees that it will pay, in addition to the royalties set forth in paragraphs 6 and 7 of the principal contract, a royalty of Three Cents (3¢) per square foot for and on account of such claimant. First Party does not intend hereby to obligate itself to reach such an accord nor does Licensee hereby intend to obligate itself to pay such additional Three Cent (3¢) royalty, except in the event that such accord is reached."

When plaintiff, by virtue of the May 1, 1949, Matthews settlement agreement, acquired the right to again enter into license agreements for the manufacture and sale of open pan awnings, under the Matthews patent, it did not offer to defendants this invention right thus acquired, under the existing licenses with defendant, and in accord with their terms. Instead plaintiff informed defendants they could obtain such rights only on surrender of their licenses and executing a new contract, which not only increased the royalty to be paid but relieved plaintiff of a number of obligations contained in the outstanding license agreements.[1]

Plaintiff would justify this conduct, first on the ground that the license agreements do not cover "further inventions * * * acquired" as it did rights in the Matthews patent, and second that to comply with its agreements with defendants would work a violation of the contract of May 1, 1949, with Matthews.

 As we construe the license agreements with defendants, plaintiff was bound to give defendants the right to use the open pan feature of the Matthews patent on acquiring such right, and plaintiff's arrangement with the Matthews' interest to execute only a certain form of license, and adherence to it, constituted a breach by plaintiff of the agreements it here sues on. The license tendered varies in many of its terms from the form attached to the settlement agreement. This raises a question as to the extent of plaintiff's authority to vary the terms. That the settlement agreement went to such length in particularizing terms of sub-licenses which plaintiff could execute, suggests that plaintiff may have been the instigator of such phases of the contract in order to get release from license contracts with defendants and others containing burdensome provisions. Many of the provisions in the new license agreements could have been of no interest to the holders of the Matthews patent. At least the record is barren that plaintiff made any real effort to secure a settlement with holders of the Matthews patent that would permit it to meet the terms of its license obligation with defendants.

In an addenda to the May 1, 1949, contract we find this provision bearing directly on the suits against this defendant by the holders of the Matthews patent: "Referring to paragraph 2, it is represented that as to the suits named as 1, 2 and 5 in Exhibit B, Kool-Vent is authorized to comply with all of the provisions of said paragraph 2, but that with respect to the suits named as 3 and 4 in Exhibit B, Kool-Vent is not at present authorized to do the acts required in paragraph 2. With respect to suits 3 and 4 Kool-Vent agrees that it will withdraw from the defense thereof and state to the courts having jurisdiction thereof that it has acknowledged validity and in-

---

1. The new license contract tendered is also of doubtful validity. Terms in it are similar to those involved in the case of National Ventilated Awning Co. v. Farm Equipment Co., D.C.N.D.Tex., 96 F.Supp. 106. There certain provisions were held void as in violation of the antitrust laws.

fringement of the Matthews' patent and has accepted an arrangement whereby any of its licensees may, by conforming to certain conditions, obtain a license thereunder." [2]

Here we assume the parties belatedly recognized lack of control by plaintiff over the suits against the defendants, so the parties contract in so far as they can to control the *result* of the cases. Plaintiff contracted by the Matthews settlement to carry the ethics of the market place into the courtroom and have a lawyer state to the Court that he is not only withdrawing as attorney in the case but, of more serious import, represent to the Court that the cause he has theretofore represented is without merit. And without prior notice or knowledge on the part of the lawyer's record client, the defendants, that is exactly what the lawyer for plaintiff did.[3]

■ We construe the covenant whereby plaintiff was to defend licenses to be an independent covenant, the performance of which was a condition precedent to the plaintiff's recovery in this case. See Wilfley v. New Standard Concentrator Co., 9 Cir., 164 F. 421; Penley Bros. Co. v. Hall, 1 Cir., 84 F.2d 371, 374. In the Penley case the Court said: "Where a patent license agreement puts the *entire* burden of defending the patent upon the licensor, it is well settled that failure to do so on his part prevents him from recovering royalties." 84 F.2d loc. cit. 374.

Plaintiff would excuse, not alone, its confessed breach of the license agreements, but manifest attempt to destroy the defense in the case brought by holders of the Matthews patent against defendants, by suggesting the settlement agreement was ultimately to come before the Court containing all that was said by its attorney in Court. What relevancy the settlement agreement would have in the case we do not pass on, but it is one thing for plaintiff to declare by contract it has no defense to the charge of infringement of the Matthews patent, but quite a different thing for defendants' attorney, hired by plaintiff, to so state in open court without the consent of defendants.

■ Defendants served cancellation notices in September following, based on plaintiff's breach of its license agreements. We conclude plaintiff's conduct supports the action taken by defendants.

That there may have been some royalties due at time of cancellation does not in our opinion change the right of plaintiff to cancel. See Penley Bros. Co. v. Hall, supra. A sum due in royalty was not justification, nor relied on at the time as justifying the conduct of plaintiff. The sum was not large and was in dispute because of loss

---

2. "3 and 4" identify the particular suits.

3. "The Court: 6392, National Ventilated Awning Company vs. Bottom and Kool Vent Awning Company.

"Plaintiff's attorney: Plaintiff is ready, your Honor.

"Defendant's attorney: Defendant is ready.

"The Court: Very well, you may proceed.

"Defendant's Attorney: May it please your Honor, yesterday there were some negotiations between the Kool Vent Metal Awning Corporation of America and the plaintiff in this case, the National Ventilated Awning Company. As a result of those negotiations, Kool Vent Metal Awning Corporation of America entered into an agreement *whereby they admitted the validity and infringement of the Matthews patent by the Kool Vent Awning here in question.*

"The situation is this: The Kool Vent

Metal Awning Corporation of America is a licensor of the defendant in this case. The defendant in this case is an independent licensee. Under the provisions of that agreement, the licensees of Kool Vent Awning Company of America have the right to obtain at the expense of Kool Vent Corporation of America immunity from any claim for past infringement and they have a right to secure a license under the Matthews patent if they elect to do so.

"That agreement was concluded at a late hour last night and *the defendants in this case were notified of it only last night and this morning.* Under those circumstances I feel that *my representation in this case was at the request of Kool Vent Corporation of America and I would like to withdraw as counsel for the defendants."* (Emphasis added.)

[Defendant's attorney, as above referred to, did not appear as counsel in this case.]

804

of right by defendants to make and sell open pan awnings.

## II.

The real question now is, the effect on defendants' cancellation of its continuance of use of the trade-mark and certain of the inventions of plaintiff, represented by patent applications, after the cancellation notices.

We find that loss of the declaratory judgment suit, whereby defendants lost the right to make and sell open pan awnings, resulted in a partial eviction. Defendants lost the right thereby to the only patented feature designated in the license agreements with plaintiff. It is our opinion it was the substance of the consideration in the license agreements flowing from plaintiff, and therefore a substantial eviction.

■ What effect does a substantial eviction have on defendants' right to cancel? Since the right to manufacture and sell the open pan awning was the monopoly which the parties contracted for, and its loss constituted a substantial eviction, defendants had a legal right to rescind. See Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 1 Cir., 176 F.2d 799, affirmed 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. ——; Victory Bottle Capping Mach. Co. v. O. & J. Mach. Co., 1 Cir., 280 F. 753.

## III.

Plaintiff argues, even though there was a partial eviction by virtue of the judgment in the suit at Cleveland, nevertheless it is entitled to have specific performance as to the "remainder" of the contracts. The position is stated:

"* * * the licensees cannot continue to adhere to all of the remaining rights under the licenses, including the numerous other inventions and the trade-mark 'Kool-Vent', and yet pay no royalties and recognize no obligations under the contracts.

"* * * The only effective rescission requires a notice to be accompanied by a bona fide tender back of the remaining property and rights to the licensor, so that the licensor may be put into original status and thereby be able to obtain another licensee and source of revenue. If there be any injuries to the licensee, he may recover his damages.

"A licensee who insists that the remaining licensed properties are valuable cannot deny any obligation to pay for them."

What did remain in the license agreements in issue after the loss of the rights under the Houseman patent? In the first license agreement with defendants two patents are listed (20,975 and 2,307,272) and one application (46,731). The two patents refer to the Houseman patent, no longer valid. The application apparently did not ripen into a patent as it is not listed in the second license. The second license again lists the Houseman patents and three applications by number. Plaintiff offered evidence of two additional patent applications, Nos. 659,349 and 118,920. All of the applications are for parts to use in connection with assembled awning in the open and jammed pan type. Defendants continue to use the trade-mark, but under a claim of ownership.

In view of the breach of the license agreements by plaintiff and the substantial eviction of defendants of the licensed rights in the Houseman patent, there only remains a shell of the former license agreements. To base the equitable remedy of specific performance on the parts that remain, of the license agreements, does not appeal to this Court as a proper and just solution of the controversy between the parties; aside from a very serious question on the practical subject of royalties. This, after all, is the motive sustaining this litigation. "* * * 'he who has done inequity cannot have equity,' * * * equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. Weegham v. Killefer, D.C., 215 F. 168, 171." Oscar Barnett Foundry Co. v. Crowe, 3 Cir., 219 F. 450, loc. cit. 454.

Both of the license agreements with defendants provide for a royalty on the net sales of awnings. The first license called for a 5% royalty "of the net selling price of all articles manufactured and sold by" the licensee. The second license increased

the royalty to 6%. There was a provision fixing a minimum sales price, in certain cases, at $1.75 and $2.50 per square foot of top awning space. The supplement to the last license provided if plaintiff reached a settlement with the holders of the Matthews patent, an additional royalty of 3¢ "per square foot" would be paid. As we view plaintiff's position, it resolves into a request of the Court to rewrite the terms of the license agreement. It was tried on that theory. The rules of evidence applicable to an infringement suit were deliberately shunned, and the record made on the case as pled. Plaintiff's suit is to secure an order calling for specific performance of part of the license agreements by defendants. Concededly this Court cannot order defendants to execute the license agreements in full. The Houseman patent is no longer valid. Plaintiff, as a party to the Cleveland case, is bound by the ruling of that Court. Defendant is enjoined from making a ventilated awning by order of this Court in a suit by the holder of the Matthews Patent. This situation and its direct bearing on defendants manufacturing and selling awnings under the licenses with plaintiff, plaintiff would avoid by having the court decree specific performance of the "remainder" of the license agreements, namely the trade-mark and awning fittings covered by patent applications. If we were to make such an order, how could the Court arrive at a royalty, *based on contract*? Plainly neither of the license agreements provided for nor contemplated the payment of a royalty on such partial consideration. The royalty was for use of the whole consideration in the license agreements. The license agreements provided for and contemplated a royalty only on a finished product; not parts, trade-mark, or improvements separately. The finished product was the open pan awning, authorized by the Houseman patent. It would not be argued we could set any other or different basis of royalty payments than those contained in the licenses. It is equally binding in a suit on the contract, we cannot decree payment of royalty on anything other, or substantially different, from that agreed to in the license agreements. It has

been ruled: "If he expected to collect royalties for the use of the second patent he should have so stated and fixed the amount. It cannot be said that the mere acquiescence by a patentee in the use of a patent for improvements upon a patented device binds the user to pay the same royalty for the improvements that is stipulated under the foundation patent." See Ross v. Fuller & Warren Co., C.C., 105 F. 510, 513.

█ We think plaintiff's remedy on its claims of infringement by defendant is by direct suit for infringement. Impliedly on defendant's cancellation plaintiff received back what defendant held under the license agreements. Defendants do not deny this conclusion. If defendants now use the trade-mark without lawful right, it is a case of infringement. The same is true of plaintiff's claim of use by defendants of articles covered by its patent applications. See Oscar Bennett Foundry Co. v. Crowe, 3 Cir., 219 F. 450, 456.

It well may be that defendants are manufacturing an awning which in an infringement suit will be held to bear on and infringe plaintiff's patent rights; also that defendant is without the legal right to use the trade-mark "Kool-Vent", but if in such a case such a result is reached, it will be within the province of the Court properly to compensate plaintiff, without doing violence to the elementary rules governing a suit on contract.

### IV.

█ On the defendants' counterclaim we are of the opinion the plaintiff, having failed to defend the infringement suits brought against the defendants, is liable in damages for the amount which the defendants expended as the result of the failure of plaintiff to comply with the license agreement.

Jurisdiction will be retained until that litigation is terminated to determine the amount due defendants. Also for plaintiff, if it desires, to make proof of any royalty due it prior to cancellation of the licenses.

As to the remaining items of defendants' counterclaim, we find defendants have failed to sustain the burden of proof.

Injunction order heretofore made as to accounting is dissolved and all funds deposited thereunder in registry of Court will be returned to defendants.

Let findings of fact, conclusions of law and order be settled between the parties, and submitted.