### WEEGHAM et al. v. KILLEFER et al.

(District Court, W. D. Michigan, S. D. April 10, 1914.)

1. CONTRACTS (§ 10*)—MUTUALITY OF OBLIGATION.

Where a contract, employing a baseball player of unique, exceptional, and extraordinary skill for the year 1913 at a specified salary, obligated the player to contract with and continue in the service of the employer for the succeeding season of 1914 at a salary to be determined by the parties to the contract, such provision, though founded on a sufficient consideration, was unenforceable for want of mutuality; the employer being expressly authorized to terminate the contract at any time on 10 days' notice.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10.*]

2. EQUITY (§ 65*)—MAXIMS—CLEAN HANDS.

The maxim, "He who comes into equity must come with clean hands," is a cardinal one, lying at the foundation of equity jurisprudence, and any willful act or misconduct in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, though not punishable as a crime or sufficient to constitute the basis of legal action, will be sufficient to bar relief in equity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*]

3. EQUITY (§ 65*)—MAXIMS—CLEAN HANDS.

Where complainants, knowing that a ball player of unique, exceptional, and extraordinary skill had entered into an unenforceable agreement to render services to defendant club for the season of 1914 induced him, by an offer of large salary, to contract with complainants for that season, and after the player had entered into a legal contract with complainants he entered into another contract to render services during the 1914 season for defendant in accordance with the original reservation,

complainants were guilty of unfairness, and were therefore not entitled to injunctive relief in equity to restrain the player from playing for defendant.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*]

In Equity. Suit by Charles Weegham and another, copartners doing business under the name of the Chicago Federal League Baseball Club, against William Killefer, Jr., and the Philadelphia National League Club. On motion for a preliminary injunction. Denied.

Order affirmed, 215 Fed. 289, 131 C. C. A. 558.

Matson, Gates & Ross, of Indianapolis, Ind., and Winston, Payne, Strawn & Shaw, of Chicago, Ill. (Kleinhans, Knappen & Uhl, of Grand Rapids, Mich., of counsel), for complainants.

Stevenson, Carpenter, Butzel & Backus, of Detroit, Mich., and Samuel M. Clement, Jr., of Philadelphia, Pa. (George Wharton Pepper, of Philadelphia, Pa., of counsel), for defendants.

SESSIONS, District Judge. This record shows that the defendant, Killefer, is a baseball player of unique, exceptional, and extraordinary skill and expertness. Unfortunately, the record also shows that he is a person upon whose pledged word little or no reliance can be placed, and who, for gain to himself, neither scruples nor hesitates to disregard and violate his express engagements and agreements. His repudiation of one contract, for the making of which he had been paid several hundred dollars, and his breach of another contract, entered into after at least a week's consideration and deliberation, give rise to the present controversy. Viewed from the standpoint of common honesty and integrity, his position in this litigation is not an enviable one.

In April, 1913, defendant Killefer entered into a written contract with the Philadelphia Ball Company (now Philadelphia National League Club) by the terms of which he bound himself to perform for the Ball Company the services of a professional baseball player during the season of 1913. Three clauses of that contract are of a special importance here:

"1. The compensation of the party of the second part stipulated in this contract shall be apportioned as follows: 75% thereof for services rendered and 25% thereof for and in consideration of the player's covenant to sanction and abide by his reservation by the party of the first part for the season of 1914, unless released before its termination in accordance with the provisions of this contract. The party of the second part shall be entitled to and shall be paid the full consideration named herein in regular semimonthly installments, unless released prior to the termination of this contract in accordance with section 8 hereof, regardless of whether or not the contracting club exercises the privilege of reserving the party of the second part for the season of 1914."

"8. It is further understood and agreed that the party of the first part may, at any time after the beginning and prior to the completion of the period of this contract, give the party of the second part ten days' written notice to end and determine all its liabilities and obligations under this contract, in which event all liabilities and obligations undertaken by said party of the first part, in this contract, shall at once cease and determine at the expiration of said ten days; the said party of the second part shall thereupon be also freed and discharged from obligation to render service to said party of the first part. If such notice be given to the party of the second part while

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

'abroad' with the club, he shall be entitled to his necessary traveling expenses to the city of Philadelphia."

"10. In consideration of the compensation paid to the party of the second part by the party of the first part as recited in clause 1 hereof, the party of the second part agrees and obligates himself to contract with and continue in the service of said party of the first part for the succeeding season at a salary to be determined by the parties to such contract."

After the close of the season of 1913, and before the first of the next year, the Philadelphia Club notified Killefer that it desired his services for another year, and would pay him an increased salary, and thereupon he again promised and agreed to play with that club during the season of 1914. Notwithstanding these agreements with the Philadelphia Club, he, upon the solicitation and at the request of the plaintiffs, entered into negotiations with the latter which, on the 8th day of January, 1914, resulted in the execution of a written contract, by the terms of which he agreed to play baseball for and with the Chicago Federal League Club, during the three seasons of 1914, 1915, and 1916, at a salary of $5,833.33 per season. At the time of the execution of this contract, plaintiffs and their manager had knowledge of Killefer's previous contract with the Philadelphia Club, and were acquainted with its provisions. Twelve days later and on January 20, 1914, Killefer executed another contract with the defendant Philadelphia National League Club, by the terms of which he agreed to play baseball for and with that club during the three seasons of 1914, 1915, and 1916, at a salary of $6,500 per annum. Since the execution of the last-mentioned contract, Killefer has entered upon its performance and intends to continue to play with the Philadelphia Club unless he is restrained from so doing. In this proceeding, plaintiffs seek an injunction restraining him from playing with any baseball team or club other than their own.

The parties concede and the authorities sustain the jurisdiction of a court of equity in a suit of this character. That the contracts of January 8th and January 20th are, in form, valid and binding upon the parties thereto must also be conceded. Therefore the questions here presented and requiring consideration are these:

First, are the provisions of the 1913 contract between the defendants, relative to the reservation of the player for the succeeding season, valid and enforceable? and, second, are the plaintiffs by their own conduct barred from seeking relief in a court of equity?

[1] The leading authorities, with possibly one exception, are agreed that executory contracts of this nature can neither be enforced in equity nor form the basis of an action at law to recover damages for their breach. The reasons for the decisions are that such contracts are lacking in the necessary qualities of definiteness, certainty, and mutuality. The 1913 contract between these defendants, relative to the reservation of the defendant Killefer for the season of 1914, is lacking in all of these essential elements. It is wholly uncertain and indefinite with respect to salary and also with respect to terms and conditions of the proposed employment. It is nothing more than a contract to enter into a contract, in the future, if the parties can then agree to contract. Although it is founded upon sufficient consideration, it lacks mutuality,

because the Philadelphia Club may terminate it at any time upon 10 days' notice while the other party has no; such option and is bound during the entire contract period. A contract exists, but, if broken by either party, the other is remediless, because the courts are helpless either to enforce its performance or to award damages for its breach. Metropolitan Exhibition Co. v. Ewing, 42 Fed. 198, 7 L. R. A. 381; Brooklyn Baseball Club v. McGuire (C. C.) 116 Fed. 782; Metropolitan Exhibition Co. v. Ward, 9 N. Y. Supp. 779; Arena Athletic Club v. McPartland, 41 App. Div. 352, 58 N. Y. Supp. 477; Rutland Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955.

[2] The principle embodied in the maxim, "He who comes into equity must come with clean hands," is a cardinal one, lying at the foundation of equity jurisprudence. Equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly "within the law." Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime or to constitute the basis of legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean. Both courts and text-writers have repeatedly spoken upon this subject in no uncertain language.

In Michigan Pipe Co. v. Fremont Ditch, Pipe Line & Reservoir Co., 111 Fed. 284–287, 49 C. C. A. 324, 327, the Circuit Court of Appeals of the Eighth Circuit, speaking by Judge Sanborn, said:

"A suit in equity is an appeal for relief to the moral sense of the chancellor. A court of equity is the forum of conscience. Nothing but good faith, the obligations of duty, and reasonable diligence will move it to action. Its decree is the exercise of discretion, not of an arbitrary and fickle will, but of a wise judicial discretion, controlled and guided by the established rules and principles of equity jurisprudence. One of the most salutary of these principles is expressed by the maxims, 'He who comes into a court of equity must come with clean hands,' and 'He who has done iniquity cannot have equity.' A court of equity will leave to his remedy at law—will refuse to interfere to grant relief to—one who, in the matter or transaction concerning which he seeks its aid, has been wanting in good faith, honesty, or righteous dealing. While in a proper case it acts upon the conscience of a defendant, to compel him to do that which is just and right, it repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit."

In Deweese v. Reinhard, 165 U. S. 386, 17 Sup. Ct. 340, 41 L. Ed. 757, Mr. Justice Brewer, speaking for the court, said:

"A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

In Larcheid v. Hashek Mfg. Co., 142 Wis. 172, 175, 125 N. W. 442, 443 (20 Ann. Cas. 576) the Supreme Court of Wisconsin said:

"The exclusion of a plaintiff from the peculiar favors of courts of equity results equally where his conduct has been unconscionable by reason of a bad motive, or where the result in any degree induced by his conduct will be unconscionable either in the benefit to himself or the injury to others."

Mr. Pomeroy in his work on Equity Jurisprudence, §§ 398, 400, and 404, says:

"Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days, that while a Court of Chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of law, or even in contradiction to those rules, while it could act upon the conscience of the defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, unrightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies.

"A contract may be perfectly valid and binding at law; it may be of a class which brings it within the equitable jurisdiction, because the legal remedy is inadequate; but, if the plaintiff's conduct in obtaining it, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith, a court of equity will refuse him the remedy of a specific performance, and will leave him to his legal remedy by action for damages."

"It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience."

Mr. Eaton in his work on Equity, at page 74, says:

"The maxim applies not only to fraudulent and illegal transactions, but to any unrighteous, unconscientious, or oppressive conduct by one seeking equitable interference in his own behalf. A court of equity will not decree the specific performance of a contract unless it is strictly equitable, and free from trickery and deception on the part of the party seeking such performance. Even if the inequity of the plaintiff is insufficient to warrant the court in canceling the contract, yet the plaintiff may be refused its enforcement. And equity will refuse its aid in the enforcement of a contract where the plaintiff has practiced fraud on the defendant, and also where the plaintiff has been guilty of unconscionable conduct which does not amount to legal fraud."

[3] Authorities to the same effect might be multiplied indefinitely. The foregoing will suffice to state and to define the universally accepted and adopted rule upon this subject. The principle thus broadly enunciated is not confined in its application to controversies of any particular nature or class, but extends generally to all cases cognizable by courts of equity. It is, however, peculiarly appropriate and applicable to cases like the present one, where relief will not be granted as a matter of strict right, but must result from the exercise of a sound judicial discretion. Measuring and testing their conduct by this rule, are the plaintiffs in court with clean hands? Knowing that the defendant, Killefer, was under a moral, if not a legal, obligation to fur-

nish his services to the Philadelphia Club for the season of 1914, they sent for him, and by offering him a longer term of employment and a much larger compensation induced him to repudiate his obligation to his employer. In so doing a willful wrong was done to the Philadelphia Club, which was none the less grievous and harmful because the injured party could not obtain legal redress in and through the courts of the land. Can it be doubted that, if the plaintiffs had not interfered, Mr. Killefer would have carried out his agreements with the Philadelphia Club in honesty and good faith? The plaintiffs and Killefer both expected to derive a benefit and a profit from their contract, and both knew that such contract, if performed, would work a serious injury to the Philadelphia Club. The conduct of both is not only open to criticism and censure, but is tainted with unfairness and injustice, if not with actionable fraud. To drive a shrewd bargain is one thing and to resort to unfair and unjust practices and methods in order to obtain an advantage over a business rival or competitor is another. Courts of equity may protect and enforce the former, but will not sanction nor lend their aid to the latter. While it is true that the plaintiffs and Mr. Killefer have entered into a legal and binding contract, for the breach of which the one may be compelled to respond in damages to the other, it is also true that, because both have acted wrongfully and in bad faith, a court of equity will neither adjust their differences nor balance their equities. The motion for an injunction must be denied, not because the executory part of the 1913 contract between the defendants was of superior or any legal force and effect, not because the contract between plaintiffs and defendant, Killefer, is not in itself such a one as the courts will enforce, not because there are any equities in Killefer's favor which excuse or exempt him from the performance of his engagements, and not because the merits of the controversy are with the Philadelphia Club, but solely because the actions and conduct of the plaintiffs in procuring the contract, upon which their right to relief is and must be founded, do not square with one of the vital and fundamental principles of equity which touches to the quick the dignity of a court of conscience and controls its decision regardless of all other considerations.