**MINNESOTA MUSKIES, INC., and Florida Professional Sports, Inc.,**
Plaintiffs,

v.

**Louis C. HUDSON and Atlanta Hawks Basketball, Inc., Defendants.**

No. C–72–G–68.

United States District Court
M. D. North Carolina,
Greensboro Division.

Jan. 16, 1969.

William D. Caffrey, of Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., for plaintiffs.

Herbert O. Davis, of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., and William G. Vance, of Sanders, Hester, Holley, Ashmore & Boozer, Atlanta, Ga., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiffs seek by this action to enjoin the defendant, Louis C. Hudson,

from playing professional basketball for any professional basketball team other than the plaintiff, Florida Professional Sports, Inc., for the term of an alleged contract he signed with the plaintiff, Minnesota Muskies, Inc., on May 3, 1967, and assigned to the plaintiff, Florida Professional Sports, Inc., on July 31, 1968. Jurisdiction is based on diversity of citizenship and the amount in controversy.

The matter has been submitted to this Court for consideration and decision on the pleadings, stipulated facts and exhibits, depositions, answers to interrogatories, briefs, and arguments of counsel.

After giving due consideration to the stipulated record, briefs, and arguments, the following facts are found:

*Facts*

1. The plaintiff Minnesota Muskies, Inc., hereinafter referred to as "Muskies," is a corporation organized and existing under the laws of the State of Minnesota, and has its principal place of business in Minneapolis, Minnesota. For the reasons later stated, the corporation is not actively operating any business at the present time.

2. During the 1967–68 professional basketball season, the Muskies operated a professional basketball team in Minneapolis, Minnesota, under a franchise issued by the American Basketball Association, and on July 31, 1968, the franchise, nineteen player contracts, and certain other equipment belonging to the Muskies, were transferred and assigned by the Muskies to the plaintiff Florida Professional Sports, Inc.

3. The plaintiff Florida Professional Sports, Inc., hereinafter referred to as "Miami," is a corporation organized and existing under the laws of the State of Florida, and has its principal place of business in Miami, Florida. The corporation was incorporated on or about July 11, 1968, and during the 1968–69 professional basketball season is engaged in the business of operating a professional basketball team known as the Miami Florid-

ians under the franchise originally issued by the American Basketball Association to the Muskies.

4. The defendant Louis C. Hudson is a citizen and resident of Greensboro, North Carolina. Hudson attended Dudley High School in Greensboro, North Carolina, where he participated in basketball and other sports. After graduating from Dudley High School in 1962, he enrolled in the University of Minnesota and attended that institution from the fall of 1962 until the spring of 1966. While attending the University of Minnesota, he played on the freshman and varsity basketball terms of that institution and was named to several all-tournament and all-star basketball teams. He was also named on the Helms Foundation All-American team following his junior year.

5. The defendant Atlanta Hawks Basketball, Inc., hereinafter referred to as "Atlanta," is a corporation organized and existing under the laws of the State of Georgia, and has its principal place of business in Atlanta, Georgia. Atlanta was incorporated on or about July 3, 1968, and during the current basketball season is engaged in the business of operating a professional basketball team in the City of Atlanta under a franchise issued by the National Basketball Association.

6. St Louis Hawks Basketball Club, Inc., hereinafter referred to as "St. Louis," is a corporation organized and existing under the laws of the State of Missouri, and has its principal place of business in St. Louis, Missouri. St. Louis formerly owned the National Basketball Association franchise under which Atlanta is now operating its professional basketball team.

7. The American Basketball Association, hereinafter referred to as "ABA," is an association of professional basketball teams that operate basketball teams in several cities in various sections of the United States under franchises issued by the ABA. The ABA was established in 1967, and its teams played their first regular season games during the 1967–68

professional basketball season. During the 1967–68 season, each ABA team played a number of regular season games, followed by a series of play-off games between certain ABA teams with the best regular season records. During the 1968–69 season, each ABA team will play regular season games and a series of play-off games will follow the regular season games.

8. The National Basketball Association, hereinafter referred to as "NBA," is an association of professional basketball teams that operate basketball teams in several cities in various sections of the United States under franchises issued by the NBA. During the 1967–68 season, each NBA team played a number of regular season games, followed by a series of play-off games between certain NBA teams with the best regular season records. During the 1968–69 professional basketball season, each NBA team will play regular season games and a series of play-off games will follow the regular season games.

9. NBA and ABA teams commence regular season play during the month of October of each year.

10. In the spring of 1966, Hudson was drafted by St. Louis in a player-draft held by the NBA, and on May 17, 1966, he signed an NBA Uniform Player Contract with St. Louis. The contract provided for the employment of Hudson as a basketball player for one year from October 1, 1966, with the following provision, known as a "reserve clause":

"24. On or before September 1 next following the last playing season covered by this contract and renewals and extensions thereof, the Club may tender to the Player a contract for the next succeeding season by mailing the same to the Player at his address shown below, or if none is shown, then at his address last known to the Club. If the Player fails, neglects, or omits to sign and return such contract to the Club so that the Club receives it on or before October 1st next succeeding, then this contract shall be deemed renewed and extended for the period of one year, upon the same terms and conditions in all respects as are provided herein, except that the compensation payable to the Player shall be the sum provided in the contract tendered to the Player pursuant to the provisions hereof, which compensation shall in no event be less than 75% of the compensation payable to the Player for the last playing season covered by this contract and renewals and extensions thereof.

"The Club's right to renew this contract, as herein provided, and the promise of the Player not to play otherwise than for the Club and its assignees, have been taken into consideration in determining the amount of compensation payable under paragraph 2 hereof."

11. The contract between Hudson and St. Louis also provided that St. Louis would pay Hudson a salary of $15,000.00 for the 1966–67 season, and contained the following provisions:

"27. This contract is a guaranteed no-cut contract for the 1966-67 season and the compensation referred to above shall be payable to the Player in any event.

"In addition to the annual compensation referred to in this contract, the Club agrees to and herewith does pay the Player the sum of $4,000.00 as and for a bonus."

12. Hudson played for St. Louis during the 1966–67 regular season, and during the NBA play-off games until St. Louis was eliminated from the play-off games on April 12, 1967. Hudson had an 18.4 points per game scoring average with St. Louis during the 1966–67 season, and was named NBA Rookie of the Year by the New York Sportswriters Association. His scoring average was the highest average of any player on the St. Louis team during the 1966–67 season.

13. On or about March 4, 1967, Hudson borrowed $4,000.00 from St. Louis, for which he executed a promissory note.

The note has typed on its face: "To be deducted from my 1967–68 contract with the St. Louis Hawks Basketball Club." Both Ben Kerner, owner of St. Louis, and Hudson testified that the loan was repaid by Hudson out of his salary from his 1967–68 contract. However, the original promissory note was still in Kerner's possession on October 16, 1968, and contained no notation that it had been paid.

14. The ABA began organizing in 1966, but its teams did not commence playing until the 1967–68 professional basketball season. The Muskies joined the ABA and received a franchise for the Minneapolis, Minnesota, area in January of 1967. Laurence P. Shields was and is the president and principal stockholder of the Muskies. A. E. Holman was the Muskies' vice-president and general manager from the time the Muskies were organized until March of 1968. Holman is no longer an employee or officer of the Muskies or Miami, although he is a minority stockholder in the Muskies. At the time of his deposition in September of 1968, and at the present time, he is a plaintiff in a law suit against the Muskies for two years' salary for an alleged breach of an employment contract. Robert Casey was publicity director of the Muskies. In 1967, the Muskies were interested in securing the services of basketball players who would have an appeal in Minnesota, including certain former players of the University of Minnesota. As general manager, it was Holman's responsibility to secure the services of players and negotiate contracts with them.

15. On May 3, 1967, Hudson signed an ABA Uniform Player Contract with the Muskies. The contract provided for the employment of Hudson as a professional basketball player for a period of three years from October 2, 1967. In an addendum to the contract, the Muskies agreed to pay Hudson for his services as follows:

| | |
|---|---|
| October 2, 1967 to October 2, 1968 – | $37,500.00 |
| October 2, 1968 to October 2, 1969 – | $42,500.00 |
| October 2, 1969 to October 2, 1970 – | $47,500.00 |

16. The addendum to the contract also provided that Hudson was to be paid a bonus of $7,500.00 upon execution of the contract, which sum was paid to Hudson by the Muskies as provided.

17. The addendum to the contract between the Muskies and Hudson further provided as follows:

"6. In the event legal proceedings be instituted to prevent and enjoin the Player from playing for the first year of this contract, and if the said legal proceeding be successful in that said Player be enjoined from playing for one year, then and in that event the Club will pay the Player the sum of $25,000.00 for the said year. The Player agrees to then play for the Club the next ensuing three years under the terms and conditions as set forth in Clause 1 of this Addendum. The Club shall choose, provide and pay for legal counsel for the defense of any such legal proceedings, save and except that Player reserves the right to choose his own counsel.

\* \* \* \* \* \*

"8. If at the end of three years (or four years if the Player is enjoined by law as referred to above) from and after October 2, 1967 the Club is non-operative, is in receivership or bankruptcy, then the injunction proceedings as provided for in paragraph 5 of the main contract shall not apply to the Player.

"Under all other circumstances paragraphs 5 and 17 of the main contract remain in full force and effect."

18. The contract between Hudson and the Muskies also contains the following provision:

"5. *Injunctive Relief*. The PLAYER hereby represents that he has spe-

cial, exceptional and unique knowledge, skill and ability as a basketball player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages and therefore agrees that the CLUB shall have the right, in addition to any other rights that the CLUB may possess, to enjoin him by appropriate injunction proceedings against playing basketball, or engaging in activities related to basketball for any person, firm, corporation or institution, or injunction against any other breach of this contract."

19. As disclosed by the deposition testimony of the various individuals involved, the parties are in disagreement with respect to the details of the negotiations that led to the signing of the Hudson-Muskies contract. From the conflicting testimony, it is found that sometime in March of 1967, at a time Hudson was still playing for St. Louis in playoff games, and while his contract with St. Louis was in full force and effect, Hudson was contacted by a representative of the Muskies for the purpose of determining whether he was interested in signing a professional basketball contract with the Muskies. After a series of telephone calls between Hudson and representatives of the Muskies organization, Hudson contacted his agent, Edward M. Cohen, an attorney in Minneapolis, and advised Cohen of his conversations with representatives of the Muskies and asked him to see what the Muskies had to offer. Hudson also advised Cohen that he would be a free agent when the NBA play-offs were over. On March 29, 1967, Cohen wrote Holman that Hudson would be a free agent, effective with the termination of the NBA play-offs, and that he was Hudson's representative for the purpose of negotiating contracts for future performances by Hudson as a basketball player. Thereafter, Cohen and Holman had a series of conferences. On April 7 or 8, 1967, Hudson went to Minneapolis, and took with him a copy of his contract with St. Louis and showed it to Cohen. Cohen immediately called to Hudson's attention the "reserve clause" in the contract, and questioned whether he would be a free agent at the end of the current basketball season. Nevertheless, it was decided that Cohen would continue his negotiations with the Muskies and keep Hudson advised as to the progress of the negotiations. Pursuant to instructions, Cohen continued his negotiations with the Muskies, during which time various offers and counter-offers were made. During the latter part of April of 1967, at Holman's request, Cohen called Hudson and asked him to come back to Minneapolis for further discussion, and advised him that the Muskies would pay his travel expense. As a consequence, Hudson was in Minneapolis on May 1, 2 and 3, 1967, during which time a series of meetings were held in Cohen's office with respect to a contract between Hudson and the Muskies. Cohen, Hudson, Barnett, Holman and Shields each attended some of the meetings, but all were not present at every meeting. The meetings culminated in Hudson and the Muskies signing the aforementioned contract on May 3, 1967.

20. All responsible officials of the Muskies, including Holman and Shields, were fully aware of the contract Hudson had with St. Louis before the contract between Hudson and the Muskies was prepared and signed, and had every reason to believe St. Louis would either exercise its option under the "reserve clause" of its existing contract or negotiate a new contract with Hudson. While some doubt was expressed as to the validity of the "reserve clause" in the St. Louis contract, officials of the Muskies recognized that Hudson might very well have additional contractual responsibilities to St. Louis for the 1967–68, and possibly subsequent, basketball seasons. Holman did not recognize any responsibility for conferring with St. Louis before executing the contract with Hudson, feeling that it was Hudson's duty to advise St. Louis as to the negotiations and the execution of the new contract.

21. Both parties to the Hudson-Muskies contract, as well as their attorneys, were uncertain as to the legal effect

of the "reserve clause" in the St. Louis contract, and this uncertainty prompted Hudson to request that Paragraph 6 of the addendum be inserted in his contract with the Muskies. Further, it was Cohen's feeling that in the event St. Louis was successful in restraining Hudson from playing under his contract with the Muskies, Hudson was entitled to some financial protection.

22. On May 18, 1967, a press conference was held at the Leamington Hotel in Minneapolis, at which time the Muskies and Hudson announced that they had signed a contract. Hudson went to Minneapolis to attend the press conference. Following the press conference, a telegram, signed by Hudson, was sent to and received by Ben Kerner, the then owner of St. Louis, in which Kerner was advised that Hudson had signed with the Muskies and was not going to play with St. Louis. The telegram also stated that Hudson had been offered an extremely lucrative contract with the Muskies, and that it was his intention to make his future career in Minneapolis. The announcement of the Hudson-Muskies contract was publicized in the news media, including newspapers in St. Louis. The announcement referred to the Muskies as having gone fishing "for a Muskie," and having come up with "one of the biggest catches in sports."

23. On May 25, 1967, one week after the Hudson-Muskies contract was publicly announced, St. Louis filed suit against the Muskies, all the other members of the ABA, and George Mikan, Commissioner of the ABA, in the United States District Court for the District of Minnesota, charging a conspiracy among the defendants, with respect to the Hudson-Muskies contract, to deliberately, maliciously, wrongfully and unjustifiably interfere with the contractual relationship which existed between St. Louis and Hudson, and seeking actual damages in the sum of $2,000,000.00 and punitive damages in the sum of $1,000,000.00.

24. On May 25, 1967, St. Louis also filed suit against Hudson in the United States District Court for the District of Minnesota, seeking an injunction against Hudson from playing basketball for any other person, firm or corporation, during the 1967–68 and the 1968–69 professional basketball seasons.

25. After Kerner received the telegram from Hudson on May 18, 1967, he immediately tried to get in touch with Hudson by calling various places where he thought he might be, and by leaving messages in Minneapolis and Greensboro for Hudson to contact him.

26. At the time Kerner received said telegram from Hudson, Ritchie Guerin, the St. Louis Coach, Bill Bridges, a member of the St. Louis team and a roommate and close friend of Hudson, and some other St. Louis players, were in South America on a basketball tour. When Guerin and Bridges returned to the United States, Kerner advised them that Hudson had signed with the Muskies. Shortly thereafter, Hudson received a message at his home in Greensboro that Bridges was attempting to contact him by telephone from St. Louis. Before returning the call, Hudson called Cohen in Minneapolis and advised that certain St. Louis players, Bill Bridges for one, were desirous of seeing and talking with him. Cohen responded by telling Hudson that it was his personal business as to whether he talked with any of the St. Louis players, but reminded him of his contract with the Muskies. When Hudson returned Bridges' telephone call, Bridges mentioned that he had read in the paper about Hudson signing a contract with the Muskies, and questioned the wisdom of Hudson signing the contract.

27. It is apparent that sometime during the early part of June of 1967 Hudson had become dissatisfied with the contract he had signed with the Muskies, and had decided to see if he could reach another agreement with St. Louis. The record is unclear as to whether Hudson first approached Kerner concerning his dissatisfaction with the Muskies contract, or whether the dissatisfaction was brought about by action initiated by Kerner. In any event, Hudson was in At-

lanta on June 4, 1967, playing golf with Bridges and some other people. Either before or after his golf game, he wrote Kerner in St. Louis expressing regrets for the trouble he had caused St. Louis, and stating that he would like to continue with the St. Louis Club. On the same day, apparently after the letter was written, Hudson called Kerner in St. Louis and made inquiry concerning the possibility of a meeting. Kerner readily agreed, and it was arranged that the meeting would be held in Atlanta.

28. On June 5, 1967, Hudson and St. Louis executed an NBA Uniform Player Contract covering a period of five years from October 1, 1967. The contract provided that Hudson would be paid the sum of $34,000.00 per year during the five-year period, in addition to a bonus of $15,000.00 for executing the contract.

29. There is evidence that the contract was actually signed by Hudson and Kerner on June 4, 1967, in Atlanta, and that the blanks in the contract were filled in by typewriter in St. Louis the following day. In any event, the contract was signed and is being honored by both parties, and it would appear to be irrelevant and immaterial as to where, or on what day, the signatures were actually affixed. Neither is it deemed relevant nor material as to whether Hudson first approached Kerner, or whether Kerner or some other representative of St. Louis first approached Hudson, with respect to the new contract. For the record, the Court will find that the contact was initiated by St. Louis, and that the meeting in Atlanta was prearranged in order to induce Hudson to enter into another contract with St. Louis.

30. Shortly after the signing of the Hudson-St. Louis contract on June 5, 1967, St. Louis submitted to a voluntary dismissal of the two actions it had brought in the United States District Court for the District of Minnesota against the Muskies, and others, and against Hudson. Answers had not been filed when the actions were dismissed.

31. Sometime in June or July of 1967, Hudson advised Cohen of the signing of the new St. Louis contract and instructed Cohen to return to the Muskies the $7,500.00 bonus the Muskies had paid him at the time he signed the Muskies contract. After receiving the instructions, Cohen called Holman and offered to return $5,000.00 of the $7,500.00 bonus, stating that this was all the money Hudson had at that time and that the balance would be paid "very shortly." Holman refused to accept the tender of $5,000.00, and also stated that he would refuse to take the full $7,500.00 should it be tendered.

32. In August of 1967, Hudson entered the Army for approximately six months. While in the Army he played for St. Louis occasionally on weekends and holidays. He was released from active military status the latter part of January of 1968, and resumed playing for St. Louis on a full-time basis.

33. On October 13, 1967, Holman wrote a letter to Hudson, in care of his attorney, Cohen, in which he stated that the Muskies were agreeable to Hudson playing out a one-year option with St. Louis, but that he was expected to perform his contract with the Muskies at the end of the one-year option period, which was understood to be October 2, 1968. Hudson was requested to respond to the letter and acknowledge that he intended to honor his contract with the Muskies. The letter was received by Hudson, but he has never responded to same. Hudson was of the opinion that he had advised St. Louis of the receipt of the letter, but Kerner has no recollection of the matter. On May 3, 1968, in response to an inquiry, Cohen advised the Muskies that Hudson's position was that he did not have any contractual obligation to perform for the Muskies.

34. Before May 6, 1968, the Muskies had retained attorneys in Minnesota and St. Louis in an effort to commence an action against Hudson, seeking an injunction. Pleadings were actually drafted, but when Hudson could not be located in Missouri or Minnesota, the Muskies secured the services of attorneys in Greensboro in an effort to locate Hud-

son. When eventually advised of Hudson's presence in Greensboro, the Muskies authorized the immediate institution of this action. The complaint was filed on May 22, 1968, and Hudson was served with copy of summons and complaint on May 23, 1968.

35. On May 3, 1968, Thomas G. Cousins and Carl E. Sanders, residents of Atlanta, Georgia, entered into a contract to purchase the NBA franchise owned by St. Louis, ten player contracts, including the Hudson contract dated June 5, 1967, and miscellaneous equipment for $3,200,000.00. Of the total purchase price, $2,990,000.00 was allocated to player contracts. Immediately after the purchase contract was executed, a public announcement of the pending sale was made. The announcement appeared in newspapers in New York, Philadelphia, Atlanta, and St. Louis, among others.

36. The purchase of the St. Louis franchise, player contracts, and other property, by Cousins and Sanders was consummated on May 10, 1968. There is no evidence that either Cousins or Sanders, or anyone else connected with the Atlanta purchase, had any knowledge of the Muskies having asserted a claim against Hudson until after the transaction with St. Louis had been closed. There is substantial evidence, however, that the transaction would not have been consummated, certainly not at the purchase price involved, if there had been any question about the Hudson contract.

37. On July 3, 1968, Sanders and Cousins transferred and assigned the NBA franchise, player contracts, and other assets they had purchased from St. Louis, to defendant Atlanta Hawks Basketball, Inc., a corporation in which Cousins and Sanders were the sole stockholders. Atlanta now owns the Hudson contract signed with St. Louis on June 5, 1967.

38. On July 31, 1968, as earlier noted, the Muskies sold and transferred to Miami the Muskies' ABA franchise, 19 player contracts, and other assets, including the contract Hudson signed with the Muskies on May 3, 1967. In consideration for the franchise, player contracts, and other assets, Miami paid the Muskies $75,000.00 in cash, executed a promissory note for $125,000.00, and delivered to the Muskies 75,000 shares of stock of Miami with a par value of $1.00 per share, making the total consideration $275,000.00. The 75,000 shares of stock transferred to the Muskies represent 50% of the outstanding stock of the Miami corporation.

39. Miami knew that this action was pending at the time it purchased the franchise and player contracts from the Muskies. Inquiry was made on behalf of Miami as to Hudson's intention, and Miami was advised by the Muskies that Hudson had stated that he would play for whichever team the Court decided he should play for. Miami will not owe the Muskies any additional consideration, and the Muskies will not be indebted to Miami for any amount, regardless of whether or not the injunction sought in this action is issued.

40. On October 3, 1968, counsel for Hudson tendered to counsel for plaintiffs a certified check in the amount of $7,500.00, as reimbursement for the bonus paid Hudson by the Muskies. The tender was refused by counsel for the plaintiffs. Counsel for Hudson have informed counsel for the plaintiffs by letter that the tender remains open for acceptance by the plaintiffs.

41. Hudson is presently playing with Atlanta, and has testified that he wants to continue to play for Atlanta. He has been Atlanta's high scorer in several games this season.

42. As of March 31, 1968, the Muskies had sustained an operating loss of $493,374.75 from their professional basketball operations during the 1967–68 season. As of April 30, 1968, the operating loss was $554,902.32.

43. The officers and stockholders of Miami have furnished Hudson personal guaranties of Miami's performance of its obligations as assignee of the Muskies-Hudson contract.

44. Hudson is highly skilled and talented, and possesses special, exceptional, and unique knowledge, skill and ability as a basketball player.

## Discussion

The sole question presented for decision is whether the plaintiffs are entitled to an injunction restraining Hudson from playing professional basketball with any team or club other than Miami for the term of the contract he signed with the Muskies on May 3, 1967, and assigned by the Muskies to Miami on July 31, 1968. Jurisdiction is not questioned, and the fact that Hudson possesses special, exceptional, and unique knowledge, skill and ability as a basketball player has been conceded.

 It is generally held that where a person agrees to render personal services to another, which require special and unique knowledge, skill and ability, so that in default the same services cannot easily be obtained from others, a court of equity is empowered to negatively enforce performance of the agreement by enjoining its breach.[1] While acknowledging this principle of law, the defendants correctly assert that equitable relief should be denied to a suitor who comes into court with unclean hands.

 One of the most fundamental principles of equity jurisprudence is the maxim that "he who comes into equity must come with clean hands." Equity demands of suitors fair dealings with reference to matters concerning which they seek relief. This maxim is stated in 2 POMEROY, EQUITY JURISPRUDENCE §§ 397 and 398 (5th ed. 1941), as follows:

"[W]henever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.

"* * * The principle involved in this maxim is merely the expression of one of the elementary and fundamental conceptions of equity jurisprudence. * * * Whatever may be the strictly accurate theory concerning the nature of equitable interference, · the principle was established from the earliest days, that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. * * *"

In Weegham v. Killefer, 215 F. 168 (W.D.Mich.), aff'd 6 Cir., 215 F. 289 (1914), in applying the maxim to a situation similar to the one presented in this case, the court stated:

"The principle embodied in the maxim, 'He who comes into equity must come with clean hands,' is a cardinal one, lying at the foundation of equity jurisprudence. Equity imperatively demands of suitors in its courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may

1. Shubert Theatrical Co. v. Rath, 2 Cir., 271 F. 827, 20 A.L.R. 846 (1921); Savoy Record Co. v. Mercury Record Corp. et al., 108 F.Supp. 957 (D.N.J. 1952); Dallas Cowboys Football Club, Inc. v. Harris, 348 S.W.2d 37 (Tex.Civ. App.1961); 4 POMEROY, EQUITY JURISPRUDENCE § 1343 (5th ed. 1941).

have kept himself strictly 'within the law.' Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime or to constitute the basis of legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean. Both courts and text-writers have repeatedly spoken upon this subject in no uncertain language."

In Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), it is stated:

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however, improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abetter of iniquity.' Bein v. Heath, 6 How. 228, 247, 12 L.Ed. 416. Thus while 'equity does not demand that its suitors shall have led blameless lives,' Loughran v. Loughran, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293; Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 387, 64 S.Ct. 622, 624, 88 L.Ed. 814; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

"This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' Keystone Driller Co. v. General Excavator Co., supra, 290 U.S. 245, 246, 54 S.Ct. 147, 148, 78 L.Ed. 293. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor."

In Mas v. Coca-Cola Co., 4th Cir., 163 F.2d 505 (1947), in affirming the action of the trial court in applying the clean hands doctrine, the court stated:

"* * * The clean hands doctrine is one which the court applies, not for the protection of the parties, but for its own protection. Its basis was well stated by Professor Pomeroy (Equity Jurisprudence, 4th Ed., sec. 397) as follows: 'It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as *actor* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' Another passage by this authoritative writer on equity jurisprudence, thus states the rule (Sec. 404): 'It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really

unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose very foundation is good conscience.'

\* \* \* \* \* \*

"Plaintiff insists that he is entitled to relief notwithstanding his fraudulent conduct because he says that the defendant Coca Cola Company also was guilty of fraud and unlawful conduct; and he contends that the court should have heard the evidence and weighed the respective guilt of the parties. There is nothing in this contention. It was sufficiently answered by the Supreme Court in the paragraph above quoted from Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., where that court says that the doors of a court of equity are closed to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, 'however improper may have been the behavior of the defendant.' And later in the opinion, after saying that plaintiff, Automotive, had not displayed that standard of conduct requisite to the maintenance of the suit in equity, it added as to the defendants, 'that the actions of Larson and Precision may have been more reprehensible is immaterial.' "

■ Measured by these fundamental principles of equity jurisprudence, the conclusion is inescapable that the Muskies, in its dealings with Hudson, soiled its hands to such an extent that the negative injunctive relief sought should be denied. This is not to say that Hudson was an innocent bystander, or that he was an unwilling participant in his dealings with the Muskies. On the contrary, viewed strictly from the standpoint of business morality, his position in this litigation, like that of the Muskies, is not an enviable one.

On May 17, 1966, Hudson, an adult with four years of university education, freely and voluntarily executed a contract to play professional basketball with St. Louis for one year, with the provi-

sion that St. Louis might renew the contract for successive basketball seasons under certain prescribed conditions. A sizeable bonus for executing the contract was paid by St. Louis and received by Hudson.

Beyond question, both Hudson and St. Louis anticipated that the contract would be renewed for subsequent years. A short time before his initial contact with the Muskies, Hudson had borrowed $4,-000.00 from St. Louis with the specific provision that it was to be repaid by deductions from his 1967–68 contract with St. Louis. Additionally, by his leading his team in scoring, and his being named Rookie of the Year in the NBA, Hudson's skill and ability as a professional basketball player had been well established during his first year with St. Louis.

While not a controlling factor, the Court is convinced that the Muskies, admittedly desirous of acquiring a winning basketball team as quickly as possible, either contacted Hudson, or caused him to be contacted by someone on its behalf, while he was still actively engaged in play-off games with St. Louis. Without this unwarranted interference on the part of the Muskies, there is every likelihood that Hudson would have fulfilled his contractual and moral obligations with St. Louis. The fact that Hudson advised Cohen, who in turn advised Holman, that Hudson would be a free agent, effective with the termination of the NBA play-offs, is of no consequence. Even if this information had been conveyed in good faith, everyone involved in the negotiations had seen a copy of Hudson's contract with St. Louis, and had full knowledge of its contents, long before the Hudson-Muskies contract was drafted and signed.

■ Basically, the plaintiffs argue that Hudson's original contract with St. Louis, because it provides for perpetual service, and is lacking in the necessary qualities of definiteness, certainty, and mutuality, is void. The contract being void and unenforceable beyond the 1966–67 season, the plaintiffs contend that their contract with Hudson is in all re-

spects valid, and that the Hudson-St. Louis contract executed on June 5, 1967, with knowledge of the existence of the Hudson-Muskies contract executed on May 3, 1967, is likewise void. Under these circumstances, plaintiffs assert that they are entitled to have their contract enforced in a court of equity. There is no merit to this argument. Even if the "reserve clause" in the St. Louis contract is of doubtful validity, the fact remains that the Muskies, knowing that Hudson was under a moral, if not a legal, obligation to furnish his services to St. Louis for the 1967–68 and subsequent seasons, if St. Louis chose to exercise its option, sent for Hudson and induced him to repudiate his obligation to St. Louis. Such conduct, even if strictly within the law because of the St. Louis contract being unenforceable, was so tainted with unfairness and injustice as to justify a court of equity in withholding relief.

St. Louis furnished a forum for Hudson and the Muskies to test the legality of the "reserve clause" in its contract by the commencement of actions against the Muskies and other members of the ABA, and Hudson, in the United States District Court for the District of Minnesota one week after the Hudson-Muskies contract was publicly announced. Hudson chose not to defend the action, but instead signed another contract with St. Louis. The Muskies chose to let Hudson return to St. Louis for the 1967–68 season rather than litigate the matter. The Muskies explained its inaction by stating that it recognized that Hudson was perhaps obligated to play for St. Louis for one more year. Notwithstanding its recognition of this obligation, the Muskies agreed to pay Hudson to sit out the 1967–68 season even if the Court should decree that the St. Louis contract was enforceable. This alone is sufficient for a court of equity to refuse relief.

Finally, plaintiffs insist that they are entitled to relief, notwithstanding their unfair and unjust conduct, because St. Louis was also guilty of inequitable and unlawful conduct in signing Hudson to a second contract on June 5, 1967, when it knew that Hudson had signed a valid contract with the Muskies on May 3, 1967. This argument is also lacking in merit. The doors of a court of equity are closed to one tainted with unfairness or injustice relative to the matter in which he seeks relief "however improper may have been the behavior of the defendant." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). It is irrelevant that the conduct of St. Louis may have been more reprehensible than that of the Muskies, since it is the devious conduct of the Muskies that created the problems presented in this litigation. Consequently, a determination of the validity of the "reserve clause" in the St. Louis contract is immaterial to a resolution of this controversy. No effort was made to avoid the contract in an honest way, but instead the Muskies consciously attempted to nullify and ignore it to the manifest injury of St. Louis. In so doing, it foreclosed its right to seek the aid of a court of equity.

The injunctive relief sought by the plaintiffs must be denied, not because the Hudson-St. Louis contract was of "any legal force and effect" or is one that "the courts will enforce," and not because the merits of the controversy are necessarily with St. Louis, "but solely because the actions and conduct of the [Muskies] in procuring the contract, upon which [its] right to relief is and must be founded, do not square with one of the vital and fundamental principles of equity which touches to the quick the dignity of a court of conscience and controls its decision regardless of all other considerations." Weegham v. Killefer, 215 F. 168, 173 (W.D.Mich.), aff'd 6 Cir., 215 F. 289 (1914).

There can be no question but that Miami acquired no greater rights to the services of Hudson than those acquired by the Muskies in its contract of May 3, 1967, and that Atlanta's rights to his services are not superior to those of St. Louis.

*Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter.

2. The plaintiffs are not entitled to the negative injunctive relief sought.

Accordingly, a judgment will be entered dismissing the complaint with prejudice.